Harold WYATT, Chem Nuclear
Systems, Inc., Plaintiffs and
Appellants,

v.

Alice KUNDERT, Secretary of State for
the State of South Dakota; State of
South Dakota, By and Through its At-
torney General, the Honorable Mark V.
Meierhenry, Defendants and Appellees,

and

Nuclear Waste Coalition, Inc., Intervenor
and Appellee.

Nos. 15087, 15090 and 15095.

Supreme Court of South Dakota.

Argued Sept. 13, 1985.

Decided Oct. 2, 1985.

Gene N. Lebrun of Lynn, Jackson, Shultz & Lebrun, P.C., Rapid City, and William J. Quirk, Columbia, S.C., for plaintiffs and appellants; Michael A. Mann, Columbia, S.C., on brief.

Thomas Harmon, Asst. Atty. Gen., Pierre, for defendants and appellees; Mark V. Meierhenry, Atty. Gen., Pierre, on the brief.

Laurence J. Zastrow of Gors, Braun, Carlon, Smith & Zastrow, Pierre, for intervenor and appellee.

HENDERSON, Justice.

## ACTION

This is an expedited appeal addressing (1) the constitutionality of Chapter 240, South Dakota Sessions Laws 1984 (Chapter 240), by way of a declaratory judgment complaint and (2) the prohibition of a statewide special election via an application for Per-

emptory Writ of Prohibition, the latter regarding this state's entry into the Dakota Interstate Low-level Radioactive Waste Management Compact. The trial court upheld Chapter 240 from constitutional attack and denied the Writ of Prohibition. We affirm in part and reverse in part and hold that the election may proceed on the second Tuesday of November 1985.

## PARTIES

Plaintiffs-appellants are Harold Wyatt and Chem Nuclear Systems, Inc. (plaintiffs). Harold Wyatt is a South Dakota citizen and taxpayer from Fall River County. Chem Nuclear Systems, Inc., is a registered corporation in South Dakota. It is involved in the business of radioactive waste disposal and it desires to establish a commercial low-level radioactive waste facility near Edgemont.

Defendants-appellees are Alice Kundert, Secretary of State for the State of South Dakota, and the State of South Dakota by and through its Attorney General, Mark Meierhenry (defendants).

Intervenor-appellee is Nuclear Waste Coalition, Inc. (intervenor). Intervenor is a nonprofit South Dakota corporation and it was the major driving force behind initiative legislation known as Chapter 240.

## FACTS

Since the inception of the Manhatten Project in the 1940's, the United States Government has exercised exclusive control over nuclear/radiological safety. The individual states, however, if an agreement state under 42 U.S.C. § 2021, or a member of a compact under 42 U.S.C. §§ 2021b through 2021d, may exercise some degree of regulation over the disposal of radioactive waste. If not an agreement or compact state, a state's authority to regulate such activities is extremely limited.

By an initiative election on November 6, 1984, the people of South Dakota approved the enactment of Chapter 240. Chapter 240, which is now codified in SDCL ch. 34–21A, reserved, among other things, to the people of South Dakota the exclusive right to approve or reject by election the joining of South Dakota to any compact with another state or states with respect to the disposal of low- or high-level nuclear waste. Before a vote may take place, however, an application must be filed with the Secretary of State. The application must contain a complete and accurate proposal detailing the applicant's plans; objective; operating procedure; social, environmental, and economic impact; and ultimate financial responsibility. The Secretary of State is then to publish a summary of the application in generally circulated South Dakota newspapers and conduct seven hearings on the application around the state with the applicant present. Then, if the voters of South Dakota approve, the above activity can take place.

In the early months of 1985, the South Dakota Legislature enacted Chapter 287, South Dakota Session Laws 1985 (Chapter 287), known as the Dakota Interstate Low-level Radioactive Waste Management Compact (Compact). This law was never subjected to a referendum petition by the people. It was signed by the Governor on March 20, 1985. The Compact establishes an interstate agreement designed to regulate and control the disposal of low-level radioactive waste generated in or imported into South Dakota. North Dakota has also enacted the Compact. However, the Compact has not become effective because it has not been approved by Congress. Article VI of the Compact provides that "the provisions of chapter 240, 1984 Session Laws of South Dakota, may not be construed to be in conflict with any provision of this Compact and may not be superseded by it."

The 1985 South Dakota Legislature also passed House Joint Resolution 1005 (HJR 1005). HJR 1005 can be found in Chapter 288, 1985 South Dakota Session Laws, and it provides in full:

> DAKOTA INTERSTATE LOW-LEVEL RADIOACTIVE WASTE MANAGEMENT COMPACT SUBMITTED TO THE ELECTORATE

A JOINT RESOLUTION, Proposing and submitting to the electors at a special election the Dakota Interstate Low-level Radioactive Waste Management Compact.

BE IT RESOLVED BY THE HOUSE OF REPRESENTATIVES OF THE STATE OF SOUTH DAKOTA, THE SENATE CONCURRING THEREIN:

That at a special election held in the state on the second Tuesday in November, 1985, the Dakota Interstate Low-level Radioactive Waste Management Compact, which is hereby agreed to, shall be submitted to the electors of the state for approval. For the purpose of conducting the election required by this Resolution, all applicable provisions of Title 12 concerning general elections shall apply.

HJR 1005 did not contain an enacting clause and was not signed by the Governor.

Secretary of State Alice Kundert proposed to conduct the election as provided in Chapter 240 and HJR 1005. Plaintiffs, however, instituted this action seeking a Peremptory Writ of Prohibition to prevent the election and also a Declaratory Judgment that Chapter 240 was unconstitutional. Plaintiffs alleged that Chapter 240 was unconstitutional because it delegates legislative power, fails to provide standards to guide the electorate, and violates the Supremacy and Commerce Clauses of the United States Constitution.

The plaintiffs and defendants stipulated that no factual question existed. The intervenors filed a motion to intervene. All parties filed briefs and a hearing was conducted on August 15, 1985. The trial court thereafter held that plaintiffs have standing and are proper parties; that a justiciable controversy exists; that intervenor is a proper party for intervention; that Chapter 240 is not unconstitutional as an improper delegation of legislative power; that it does not violate the Supremacy and Commerce Clauses of the United States Constitution; and that a Peremptory Writ of Prohibition will not be granted because: (1) adequate remedies at law exist, (2) the acts sought to be restrained are ministerial and not sub-

ject to a Writ of Prohibition, (3) the action was not timely commenced, and (4) it would be tantamount to an advisory opinion. The trial court also specifically declined to rule on the defendants' interpretation that Chapter 240 does not constitute a referendum upon Chapter 287 (the Compact) and declined to rule on the defendants' interpretation that HJR 1005 is not a properly enacted law and does not constitute a referendum upon the Compact.

From the trial court's order, the plaintiffs have appealed. From the trial court's refusal to adopt defendants' additional proposed conclusions of law, the defendants seek review. From the trial court's conclusion that plaintiffs are proper parties, the intervenor seeks review.

On August 30, 1985, this Court expedited the appeal and ordered the filing of simultaneous briefs. Oral arguments were heard on September 13, 1985. We address only those issues we deem relevant to this expedited appeal.

## DECISION

### I.

DOES THE LEGISLATURE HAVE THE INHERENT POWER TO REFER ITS OWN ACTS? WE HOLD THAT IT DOES.

As stated in the facts above, the 1985 Legislature, through HJR 1005, resolved that an election be held so as to submit the Compact to the electors for approval. Thus, it is the enacting of the Compact which is set for election. The defendants contend that this was a proper exercise of the inherent legislative power to refer statutes or submit questions to the voters. With this contention, we agree.

The South Dakota Constitution, unlike the Constitution of the United States, does not constitute a grant of legislative power. Instead, our constitution is but a limitation upon the legislative power and the legislature may exercise that power in any manner not expressly or inferentially proscribed by the federal or state constitu-

tions. *See McDonald v. School Bd. of Yankton,* 90 S.D. 599, 606, 246 N.W.2d 93, 97 (1976); *Clem v. City of Yankton,* 83 S.D. 386, 396, 160 N.W.2d 125, 130 (1968); and *Kramar v. Bon Homme County,* 83 S.D. 112, 115, 155 N.W.2d 777, 778 (1968). Thus, except as limited by the state and federal constitutions, the legislative power of the state legislature is unlimited. *See Clem, id.; Acker v. Adamson,* 67 S.D. 341, 346, 293 N.W. 83, 85 (1940); and *State ex rel. Wagner v. Summers,* 33 S.D. 40, 49, 144 N.W. 730, 732 (1913). "What the representatives of the people have not been forbidden to do by the organic law, that they may do." *State ex rel. Payne v. Reeves,* 44 S.D. 568, 587, 184 N.W. 993, 996 (1921). "Consequently, in determining whether an act is unconstitutional we search the state and federal constitutions for provisions which prohibit its enactment rather than for grants of such power." *Clem, id.* A presumption in favor of constitutionality is also accorded any legislative act and that presumption is not overcome until the act is clearly and unmistakably shown to be unconstitutional and no reasonable doubt exists that it violates constitutional principles. *South Dakota Ass'n of Tobacco & Candy Distrib. v. State,* 280 N.W.2d 662, 664–65 (S.D.1979).

A search of the state and federal constitutions, however, reveals no provision which prohibits the legislature's power to refer or submit legislative actions to a vote of the electors. On the contrary, this Court, in *State ex rel. Cranmer v. Thorson,* 9 S.D. 149, 151, 68 N.W. 202, 202 (1896), expressly recognized the legislature's inherent power to submit, by joint resolution, questions to the voters. In *Cranmer,* this Court stated: "The court is aware of no law prohibiting the legislature from submitting any question its wisdom may suggest. It may submit a question not intended to change the organic law." *Id.* While some may advocate that the adoption of Article III, § 1, to the South Dakota Constitution, after the *Cranmer* decision, removed the legislature's inherent power to refer legislative acts, this Court, in *State ex rel. Wagner v. Summers,* 33

S.D. at 49–52, 144 N.W. at 732–33, again recognized that the legislature could submit legislative acts or questions to a vote of the electors. Thus, South Dakota Constitution Article III, § 1, has not removed the legislature's inherent referral power and the restrictions imposed by and through Article III, § 1, apply only to referendums of the people and not to a referendum by the legislature. *See also,* 1975–1976 Biennial Rep. S.D. Att'y Gen. 75–31 and 75–191.

In the present case, HJR 1005 constituted a valid exercise of the legislature's inherent power to refer its own acts. Moreover, Chapter 240 is the statute which authorizes the election. Since the election is properly referred and authorized by law, it will be held as scheduled. The only question remaining on this particular issue, is whether the election results will or will not be binding upon the legislature.

In *Cranmer,* this Court recognized that the legislature could submit questions to a vote of the people even though it would not change the law. The defendants thus contend that the results of the election should be concluded by us to be nonbinding upon the legislature and the Compact. Based on the language of Chapter 240, HJR 1005 and the Compact, however, we reach the opposite conclusion. Chapter 240 specifically provides, inter alia, that:

> The people of South Dakota reserve to themselves the exclusive right to approve or reject . . .:
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> . (2) the joining of South Dakota to any compact with another state or states with respect to the disposal of low-level nuclear waste or high-level nuclear waste.
>
> These activities shall not take place without the approval of the voters of South Dakota voting in an election. . . .

Article VI of the Compact also provides, inter alia:

> All laws and regulations, or parts thereof, of any party state or subdivision or instrumentality thereof which are in conflict with this Compact are hereby

superseded to the extent of the conflict. However, the provisions of chapter 240, 1984 Session Laws of South Dakota, may not be construed to be in conflict with any provision of this Compact and may not be superseded by it. . . .

HJR 1005, as recited in the facts above, also required that the Compact "be submitted to the electors of the state for approval."

Both Chapter 240 and the legislative referral, HJR 1005, require the electorate's *approval* and the Compact itself goes to great lengths so as not to supersede Chapter 240. We cannot interpret such strong language and the interconnection of these provisions to mandate a nonbinding legislative referral of the Compact. If such a result had been intended, more specific and definite language, leading to such a conclusion, most assuredly would have been used.

## II.

### IS CHAPTER 240 UNCONSTITUTIONAL IN PART IN THAT IT ATTEMPTS TO CREATE AN AUTOMATIC LEGISLATIVE OR ELECTORATE REFERRAL? WE HOLD THAT IT IS.

South Dakota was the first state to adopt a constitutional amendment which reserved legislative powers to its citizens. *See* S.D. Const. art. III, § 1, adopted in 1898. Thereafter, the initiative and referendum process spread to almost every state in the Western United States. In South Dakota, the initiative and referendum process has been extended to counties, school districts, and conservation districts. *See* respectively, SDCL ch. 7–18A; SDCL §§ 13–6–41 to 13–6–49, inclusive; and SDCL 38–8A–12.

██ The right to initiate and refer legislation, "however, is not self-executing and is subject to constitutional, legislative and administrative provisions, statutes and rules so as to protect the implementation and integrity of this process." *Baker v. Jackson,* 372 N.W.2d 142, 145 (S.D.1985). To constitute a valid referral of a legislative enactment, the following requirements must be met: (1) The law must be a proper

subject of a referral, SDCL 2–1–3; (2) the referendum petition must be in the proper form, *see* SDCL §§ 2–1–3, 2–1–7, 2–1–8, 2–1–9, 2–1–10, ARSD 5:02:08:00(3), ARSD 5:02:08:08, and *Baker;* (3) a copy of the petition must be filed with the Secretary of State prior to its circulation, SDCL 2–1–6.1; (4) the petition must be signed by the required number of qualified electors, *see* S.D. Const. art. III, § 1, SDCL §§ 2–1–3, 2–1–5, 2–1–6, 2–1–8, and ARSD 5:02:08:00.01; and (6) the petition must be filed in the office of the Secretary of State within ninety days after the adjournment of the legislature which passed the law, SDCL 2–1–4.

██ In light of the foregoing constitutional provisions, legislative statutes and administrative rules, which dictate the mandatory legal procedures for referring legislation, we cannot conclude that Chapter 240, standing alone, constitutes a valid automatic in futuro referendum upon all legislative enactments regarding nuclear waste disposal. The opposite conclusion would negate the above-referenced provisions, statutes and rules, and this we cannot do. At best, Chapter 240 constitutes an additional codification of the people's desire to participate in legislative decisions concerning radioactive disposal and statutorily authorizes referendum elections *after* the hereinbefore-cited legal requirements have been fulfilled. Thus, in the future, if the electors desire a referendum election on legislative enactments concerning radioactive disposal, the proper referendum procedures will have to be fulfilled.

Nor can we conclude that Chapter 240 mandates or constitutes an automatic, in futuro, legislative referral of all enactments concerning nuclear waste disposal. Each South Dakota Legislature, in the future, can and must exercise its own independent inherent power to refer acts or questions to a vote of the people. Chapter 240 cannot bind future legislatures/legislative assemblies to an automatic exercise of its inherent power to refer. An opposite construction of Chapter 240 would lead to an unconstitutional infringement of the leg-

islature's independent discretion and would burden the legislature's inherent power to refer those acts it deems a proper subject of legislative referral.

■ Thus, to the extent that Chapter 240, Section 1, can be read as providing for an automatic in futuro legislative or electorate referral, we determine it to be an unconstitutional expression of the legislature's power in that it exceeds the inherent power of the legislature. "[T]he unconstitutional provisions of a statute or act may be extracted and the remainder left intact." *Direct Auto Buying Service, Inc. v. Welch*, 308 N.W.2d 570, 575 (S.D.1981).

### III.

### DOES CHAPTER 240 UNCONSTITUTIONALLY DELEGATE LEGISLATIVE AUTHORITY? WE HOLD THAT IT DOES NOT.

Plaintiffs contend that the election called for in Chapter 240 is an unconstitutional delegation of legislative power and a delegation of legislative power without proper guidelines. The trial court reached the opposite conclusion. We affirm the trial court's determination.

■ As early as 1913, this Court, in *State ex rel. Wagner v. Summers*, 33 S.D. at 50, 144 N.W. at 732, recognized that the "exercise of the referendum is not an exercise of delegated legislative power; it is in effect the exercise of the veto power." The rationale for this conclusion has recently been outlined in *City of Eastlake v. Forrest City Enterprises, Inc.*, 426 U.S. 668, 672–73, 96 S.Ct. 2358, 2361–62, 49 L.Ed.2d 132, 137 (1976), wherein Chief Justice Burger wrote:

A referendum cannot, however, be characterized as a delegation of power. Under our constitutional assumptions, all power derives from the people, who can delegate it to representative instruments which they create. *See*, e.g., Federalist Papers, No. 39 (Madison). In establishing legislative bodies, the people can reserve to themselves power to deal directly with matters which might otherwise

be assigned to the legislature. *Hunter v. Erickson*, 393 U.S. 385, 392, 21 L.Ed.2d 616, 89 S.Ct. 557, 47 Ohio Ops.2d 100 (1969).

. . . The referendum . . . is a means for direct political participation, allowing the people the final decision, amounting to a veto power, over enactments of representative bodies. The practice is designed to "give citizens a voice on questions of public policy." (Citation omitted.)

*See also, Currin v. Wallace*, 306 U.S. 1, 15, 59 S.Ct. 379, 387, 83 L.Ed. 411, 451 (1939), wherein the Supreme Court rejected as untenable the argument that a Congressionally prescribed referendum constituted an unconstitutional delegation of legislative power.

■ We perceive no reason to depart from our long-standing ruling in *State ex rel. Wagner v. Summers*, *id.*, or the rationale advanced in *Eastlake*. This Court, in numerous cases, has upheld the referendum power from constitutional attack, and to now hold that the referendum process, whether it be a referral by the legislature or the people, constitutes an unconstitutional delegation of legislative power, would do great violence to those decisions. This we cannot do. A referendum is not a delegation of legislative power. On the contrary, it is the exercise of the veto power. Plaintiffs' contentions in opposition are not sustainable.

■ As for the plaintiffs' assertion that Chapter 240 is a delegation without proper standards to guide the delegate, we again refer to the Supreme Court's decision in *Eastlake*. In *Eastlake*, when confronted by a similar assertion, i.e., that a delegation of power must be accompanied by discernible standards so that the delegatee's action could be measured, the Supreme Court dismissed the assertion holding that such was "inapplicable where, as here, rather than dealing with a delegation of power, we deal with a power reserved by the people to themselves." 426 U.S. at 675, 96 S.Ct. at 2363, 49 L.Ed.2d at 138–39. We, too, sum-

marily dismiss the plaintiffs' contention in this regard. A referral, by the legislature or the people, is not a delegation of legislative power to an administrative or regulatory agency. Hence, the ascertainable standards vital in an administrative/regulatory agency scenario are inapplicable to the case at hand.

## IV.

DOES CHAPTER 240 VIOLATE THE SUPREMACY AND COMMERCE CLAUSES OF THE UNITED STATES CONSTITUTION? WE HOLD THAT IT DOES NOT.

The trial court concluded that Chapter 240 did not violate the Supremacy and Commerce Clauses. Plaintiffs assert such a conclusion is erroneous. We disagree and affirm the trial court.

Chapter 240 cannot be read in isolation when deciding this issue. Chapter 287, the Dakota Compact, must be read in conjunction with Chapter 240 to determine if Chapter 240 has violated the Supremacy and Commerce Clauses of the United States Constitution.

"[I]t is the policy of the Federal Government that low-level radioactive waste can be most safely and efficiently managed on a regional basis." 42 U.S.C. § 2021d(a)(1)(B). In 42 U.S.C. § 2021d(a)(2)(A), it is provided that "the States may enter into said compacts as may be necessary to provide for the establishment and operation of regional disposal facilities for low-level radioactive waste."

▮ Therefore, the federal government has permitted the states to control radioactive waste activities but this cannot be inconsistent with federal requirements. Via Chapter 287, South Dakota has entered upon an undertaking in radioactive wastes which is known as the Dakota Compact. Chapter 240, however, permits the people, after appropriate legislative or electorate referral, to vote on whether or not they wish to join *any* compact with another state or states. The election to be held is not on any compact but is on the Dakota Compact with sister state North Dakota. There is no federal restriction whatsoever upon the method by which the State of South Dakota determines the kind of regional compact which it will enter into. We note that there are no radioactive waste disposal sites in this state, and, therefore, Chapter 240 cannot be said to create a bar to the importation of radioactive wastes since no importation is being attempted or has taken place in the past. Chapter 240 has not sought to treat in-state and out-of-state radioactive waste in an unequal, unfair, or in an unevenhanded manner. To aver that there is an effect on interstate commerce, as pertains to radioactive wastes in South Dakota, is entirely speculative. South Dakota simply has no interstate or intrastate disposal of radioactive wastes and is struggling at the polls and in the legislature as to what is to be done in the future. We have not interfered with the dictates of federal law nor sought to regulate activities which are exclusively within the control of the federal government. We are struggling with the method by which we enter into an agreement regarding the disposal of low-level radioactive waste. We do not view the law to be that the federal government has entirely preempted activities concerning low-level waste. Apparently, if it wishes to do so, it can. *Washington State Bldg. & Constr. Trades v. Spellman,* 684 F.2d 627 (9th Cir. 1982), *cert. denied,* 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983). It has declined to do so, thus far. Surely, the state must be permitted an opportunity to struggle with the propriety of entering into a compact or compacts with sister states.

▮ As previously held herein, Chapter 240 does not constitute an in futuro referral, by the legislature or the electorate, of state legislative activities concerning nuclear waste. Thus, in the future, if the voters of South Dakota wish to refer such state legislation, they will have to comply with the statutes and rules governing referendums or the legislature will have to exercise its inherent power to refer its acts to a vote of the people. However, HJR 1005

does constitute a valid legislative referral of the Compact and Chapter 240 is the law which authorizes the election. *State ex rel. Wagner v. Summers,* 144 N.W. 730; *Cranmer v. Thorson,* 68 N.W. 202. Thus, the election set for November 12, 1985, is properly called.

■ Under our previous ruling and the facts and circumstances of this case, we perceive no violation of the Supremacy and Commerce Clauses of the United States Constitution. As noted in the facts above, the federal government exercises exclusive control over radiological/nuclear safety. A state may, however, exercise some degree of regulation if it is an agreement state under 42 U.S.C. § 2021 or a compact state under 42 U.S.C. §§ 2021b through 2021d. South Dakota, in an attempt to become a compact state, enacted the Dakota Compact and it is the enacting of the Compact which is set for election. How South Dakota decides to enter a compact, i.e., by a legislative enactment or election, in no manner conflicts with or contravenes federal regulations or statutes. Chapter 240 does not burden or affect interstate commerce and does not constitute an in futuro legislative or electorate referral of federal nuclear waste activity. This last conclusion is based, in part, upon the following rationale: First, Chapter 240, an initiated measure, ipso facto, does not constitute an ongoing legislative or electorate referral, and second, the referral process cannot be implemented concerning federal activity such as issuance of federal licenses, federal legislation, and federal regulatory decisions, by way of example. The referral process embodied in South Dakota Constitution Article III, § 1, and the legislature's inherent referral power concerns South Dakota legislative enactments only. Thus, we see no present Supremacy or Commerce Clause infirmity.

### V.

DO THE PLAINTIFFS HAVE STANDING TO COMMENCE THESE PROCEEDINGS? WE HOLD THAT THEY DO.

The plaintiffs commenced this action by filing an Application for Peremptory Writ of Prohibition and a Complaint seeking a Declaratory Judgment. Intervenor contested the plaintiffs' standing but the trial court concluded otherwise.

On appeal, intervenor persists in its objection to the plaintiffs' standing; but to the extent that we have concluded that the election shall take place, we deem it unnecessary to resolve the question of the plaintiffs' standing in regard to the Writ of Prohibition.

■ As for the plaintiffs' standing in regard to the Declaratory Judgment, we answer that issue affirmatively. Plaintiff Harold Wyatt is a South Dakota resident citizen and taxpayer. Plaintiff Chem Nuclear Systems, Inc., is a registered South Dakota corporation and also a taxpayer. "[A] taxpayer need not have a special interest in an action or proceedings nor suffer special injury to himself to entitle him to institute an action to protect public rights." *State ex rel. Jensen v. Kelly,* 65 S.D. 345, 347, 274 N.W. 319, 321 (1937). "The constitutionality of legislation affecting the use of public funds is a matter of public right." *State ex rel. Parker v. Youngquist,* 69 S.D. 423, 426, 11 N.W.2d 84, 85 (1943). "[O]wnership, special interest, or injury is not a prerequisite to litigate a case ... involving public funds." *Kanaly v. State,* 368 N.W.2d 819, 827 (S.D.1985). It is beyond conjecture that the constitutionality of Chapter 240 affects the use of public funds. Therefore, we conclude that the plaintiffs, as taxpayers, have standing to raise its constitutionality in this regard.

### VI.

DOES CHAPTER 240 REQUIRE PUBLIC HEARINGS PRIOR TO THE VOTE ON SOUTH DAKOTA'S ENTRY INTO THE COMPACT? WE HOLD THAT IT DOES.

Defendants requested the trial court to rule on this issue but the trial court declined to so rule. On appeal, defendants

now request this Court to rule on this issue. We shall.

Chapter 240, Section 1, states:

[A] vote shall not take place until an application is submitted to the Secretary of State; until a summary of the application is published in generally circulated South Dakota newspapers by the Secretary of State, cost to be borne by the applicant; and until at least seven hearings on the application, with applicant present to answer questions, are conducted around the state by a neutral party appointed by the Secretary of State, cost to be borne by the applicant.

Chapter 240, Section 4(4), defines application as "a complete and accurate proposal detailing the applicant's plans; objective; operating procedure; social, environmental and economic impact; and ultimate financial liability."

▪▪▪▪ Defendants assert that because the word "application" does not include the activity of joining a compact, we should rule that the hearings are not required. Chapter 240, Section 4(5), however, partially defines applicant as "the state legislature together with the governor in the case of a proposed compact...." Statutes must be construed so as to harmonize and give effect to all provisions. *Matter of Silver King Mines*, 315 N.W.2d 689, 691 (S.D. 1982); *Northwest Fin. Co. v. Nord*, 70 S.D. 549, 554, 19 N.W.2d 578, 580 (1945). The governor and the legislature are the applicant in the case of a proposed compact. The applicant must be present at the hearings and the voters must approve the compact. We interpret the proposed compact as constituting the application. Thus, hearings on the application, i.e., the Compact, must be held as required in Chapter 240.

Defendants lastly contend, in the alternative, that the hearings should not be required because the effect of requiring the entire legislature together with the governor to be present at seven hearings around the state creates an impossible situation. Nothing in Chapter 240, however, prevents the governor or the legislature from sending a qualified representative or represent-atives. The legislature can surely select from its members, or the governor from the executive department, representatives to attend and participate in the required hearings. Assuredly, the entire legislature and the governor need not personally attend. A procedure, with representatives from the governor's office and the legislature, can be devised to effectuate a procedure which is reasonable in attaining the purposes of Section 1, Chapter 240. An impossible situation simply does not exist and we cannot ignore the hearings requirement of Chapter 240. The Secretary of State, the governor's office, and the legislature through its leadership, should immediately proceed to comply with the dictates of Chapter 240.

## CONCLUSION

▪▪▪▪ We affirm in part and reverse in part. Chapter 240 is unconstitutional so far as it purports to provide for an in futuro legislative or electorate referral upon all legislative enactments regarding nuclear waste. In the future, as now, the electors are required to comply with referendum statutes and procedures and the legislature, in its own discretion, will decide whether or not to exercise its inherent legislative power to refer such acts, absent an electorate referral, to a vote of the people. In the present case, however, as regards the legislature and its power, HJR 1005 does constitute a valid exercise of inherent legislative power to refer statutes or questions and Chapter 240 is the law which authorizes the election. Chapter 240 is not an unconstitutional delegation of legislative power and does not violate the Supremacy and Commerce Clauses of the United States Constitution. Plaintiffs have standing in this action and the hearings required by Chapter 240 must be held. We deem all other issues presented herein resolved by the issues addressed or unnecessary to the resolution of this case.

MORGAN, J., and HERTZ, Circuit Judge, Acting as Supreme Court Justice, concur.

FOSHEIM, C.J., and WUEST, Circuit Judge, Acting as Supreme Court Justice, dissent.

WUEST, Acting Justice (dissenting).

I dissent.

The people of this state have a right to vote on the Dakota Compact, but in my opinion, that right should be exercised according to Article III of the South Dakota Constitution, relating to initiative and referendum. After much debate and deliberation, our forefathers devised an orderly procedure for the people to legislate (by initiative), or veto acts of the legislature (by referendum).

The best constitutional vehicle for opponents of the Dakota Compact to bring the law to a vote of the people was the referendum. It was not, however, timely invoked. Perhaps because opponents of the Compact were lulled to sleep by the provisions of Chapter 240. Nevertheless, they may still initiate a repealer and obtain a vote of the people on the Compact in the 1986 general election, as the Compact provides:

> Any party state may withdraw from this Compact by enacting a statute repealing its enacting legislation. Unless permitted earlier by unanimous approval of the commission, withdrawal shall take effect five years after the governor of the withdrawing state has given notice in writing of withdrawal to the commission and the governor of each party state. No withdrawal may affect any liability already incurred by or chargeable to a party state prior to the time of withdrawal.

1985 S.D.Sess.L. ch. 287 Art. III (General Provisions) (emphasis added).

In my opinion, the election suggested for November 12, 1985, is illegal and unconstitutional for the following reasons.

An election can only be held when authorized by law. *Kane v. Kundert,* 371 N.W.2d 172 (S.D.1985); *Sioux Falls Electric Light & P. Co. v. City of Sioux Falls,* 21 S.D. 18, 108 N.W. 488 (1906); *State v. Gardner,* 3 S.D. 553, 54 N.W. 606 (1893); *In re Supreme Court Vacancy,* 4 S.D. 532, 57 N.W. 495 (1894).

With the exception of a special election to fill a congressional vacancy under SDCL ch. 2–11, South Dakota Law makes no provisions for special elections. A joint resolution, such as HJR 1005, is not a law and cannot authorize an election. As to this, in *State v. Summers,* 33 S.D. 40, 54, 144 N.W. 730, 734 (1913), we quoted *McDowell v. People,* 204 Ill. 499, 68 N.E. 379 (1903), which stated that " '[a] resolution or order *is not a law,* but merely the form in which the legislative body expresses an opinion.' " (Emphasis added.)

It is claimed that Chapter 240 of the 1984 South Dakota Session Laws requires an election before the Dakota Compact (Chapter 287, 1985 Session Laws) can be effective. Section (6) of Chapter 240 provides that the election referred to in the Act "means the next regularly scheduled statewide general election unless a special election is warranted to meet legal deadlines as defined in the Low-Level Radioactive Waste Policy Act and the Nuclear Waste Policy Act." 1985 S.D.Sess.L. ch. 240, § 4(6).

The problem with calling a special election under Chapter 240 concerns who decides whether such an election "is warranted to meet legal deadlines...." Is it the Secretary of State, the Governor, the Legislature, Supreme Court, or some other governmental body? The answer to this question is not contained within the parameters of Chapter 240.

While the legislature may delegate the responsibility of working out the details of a law, the discretion entrusted to the legislature to choose policies and make law cannot be delegated. *Boe v. Foss,* 76 S.D. 295, 77 N.W.2d 1 (1956). The legislature, of course, must provide a guide or standard to direct the body charged with working out the details of a law, otherwise, there would be an unconstitutional delegation of uncontrolled discretion and arbitrary power. The legislature must declare the policy of the law to guide an administrative agency or other governmental body, and fix the legal

principles which are to control in given cases. Cooley, *Constitutional Limitations*, at 229. Then, as Chief Justice Marshall put it, others can act "to fill up the details" under the general provisions made by the legislature. *Wayman v. Southard*, 10 Wheat. 1, 43, 23 U.S. 1, 43, 6 L.Ed. 253 (1825).

In my opinion, the provisions of 1985 S.D.Sess.L. ch. 240 must fail for, by its language, "unless a special election is warranted to meet legal deadlines" there has been an unlawful delegation of legislative power to some unknown entity. Perhaps, if section six of Chapter 240 had specified that our legislature was the governmental body charged with making the decision as to whether a special election is warranted, we might hold that the legislature could exercise its power without standards and adopt the resolution. But the legislature did not and could not rehabilitate section six of Chapter 240 by resolution. Thus, there is no law authorizing a special election and, under the provisions of section six, no governmental body, including the legislature, has been authorized to call one.

Further, I believe that HJR 1005 and Chapter 240 provide individually or in concert for an unconstitutional referral of a statute to a vote of the public. As the majority opinion states, "[t]he right to initiate and refer legislation ... 'is not self-executing and is subject to constitutional, legislative and administrative provisions, statutes and rules so as to protect the implementation and integrity of this process.' " (*Citing Baker v. Jackson*, 372 N.W.2d 142, 145 (S.D.1985). The majority cites *State ex rel. Cranmer v. Thorson*, 9 S.D. 149, 68 N.W. 202 (1896), for the proposition that the legislature has the power to refer its acts to a vote of the people. This power was removed, however, with the adoption of Article III, § 1 of the South Dakota Constitution, which mandates that an initiative or referendum vote can only be invoked by a petition of five percent of the qualified electors of the State. While the majority cites *State v. Summers*, 33 S.D. 40, 144 N.W. 730 (1913), as authority for the argument that Article III did not alter the power of the legislature to refer its acts to the public, the language referred to in that case was merely dictum.

The South Dakota Constitution is a limitation upon the legislative power which may not be exercised in any manner that is expressly or inferentially proscribed by the constitution. *Clem v. City of Yankton*, 83 S.D. 386, 160 N.W.2d 125 (1968); *Kramar v. Bon Homme County*, 83 S.D. 112, 155 N.W.2d 777 (1968); *In re Watson*, 17 S.D. 486, 97 N.W. 463 (1903). Article III, § 1 of the South Dakota Constitution was adopted by the people of South Dakota as the orderly procedure to invoke an initiative or referendum. Any attempt to change this procedure is inconsistent therein and, unconstitutional. As the United States Supreme Court ruled years ago, an unconstitutional law "is not a law; it confers no right; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it has never been passed." *Norton v. Shelby County*, 118 U.S. 425, 442, 6 S.Ct. 1121, 1125, 30 L.Ed. 178, 186 (1885). An election not specifically authorized by law is a nullity. *Sioux Falls Electric, supra; In re Contest of Election of Vetsch*, 245 Minn. 229, 71 N.W.2d 652 (1955); 29 C.J.S. Elections § 66 (1965). Therefore, I would grant the writ of prohibition.

I concur with the opinion of the majority that plaintiffs have standing to commence these proceedings.

I am authorized to state that Chief Justice FOSHEIM joins in this dissent.