CANTIL-SAKAUYE, C. J.,
Concurring.—As the majority observes, I dissented from this court’s August 2014 order removing an advisory measure, designated Proposition 49, from California’s November 2014 general election ballot. My vote was based on my conclusion that petitioners had failed to make a sufficient showing of the invalidity of the challenged measure to warrant removing it from the ballot.
The court’s opinion, arrived at following full briefing, oral argument, and extensive deliberation, concludes that the Legislature properly exercised its *524 authority in enacting the statute submitting that advisory measure to a vote of the statewide electorate. The decision upholds the Legislature’s enactment as a permissible means of investigating policy options regarding the Legislature’s exercise of authority under article V of the federal Constitution concerning a possible amendment to the federal Constitution. In the process the majority rejects the contrary arguments of petitioners. I agree with the majority’s conclusion that, after full consideration, the challenged measure is valid and that petitioners’ objections fail. Accordingly, I have signed the majority opinion.
I write separately to avoid any misunderstanding or implication that legislatively authorized advisory ballot measures are permissible only concerning the narrow universe of matters relating to the Legislature’s role under article V of the federal Constitution (sometimes, article V). As I will explain, legislative authority to pose advisory ballot questions has long been properly employed—by our own Legislature, by the legislatures of numerous other states, and by local legislative bodies (such as county boards of supervisors and city councils) throughout California and the nation—to obtain the views of the voters concerning all manner of subjects reasonably within a legislative body’s authority to act. Nothing in today’s decision should be viewed as calling into question the validity of all types of statewide and local advisory ballot measures, even those completely unrelated to any proposed amendment to the federal Constitution.
Before addressing the legal principles and precedent supporting the Legislature’s general authority to submit advisory measures to a vote of the people, it is useful to review in some detail the long-standing historical and recent practice demonstrating that legislatively initiated advisory ballot measures have been used regularly and extensively concerning a wide variety of subjects both within California and nationwide. This considerable use of advisory ballot measures may not be as well known within the legal community or among the general public as it perhaps should be, but this practice is important to keep in mind when the question of the permissible scope of advisory ballot measures is considered.
I. Legislative Use of General Advisory Ballot Measures in California and Nationwide, Unconnected with Any Article V Role or Related Issue
A. Seven prior advisory policy measures submitted to California’s statewide electorate
As section 2, subdivision (m) of the challenged statute (Stats. 2014, ch. 175) itself observes, ballot measures seeking the nonbinding advisory views *525 of the voters have been used in the past in this state. On seven prior occasions the Legislature has submitted advisory ballot measures to the statewide voters, most of them unconnected to any effort to amend the federal Constitution. And, like the statute currently under review, when the Legislature’s questions pertained to issues over which the federal government has ultimate control, the measures have directed that the ballot results be conveyed to Congress.
The first advisory ballot measure in California—an ugly reflection of its times, asking the statewide voters whether they were “ ‘[f]or’ ” or “ ‘[algainst' ” Chinese immigration—was submitted to California voters by the Legislature in 1877 (Stats. 1877, ch. 5, p. 3), and appeared on the statewide general election ballot in September 1879, just a few months after the voters had approved a newly proposed state Constitution at a special election in May 1879. That advisory measure required, similarly to the one at issue here, that the result of the balloting be conveyed to Congress. (Stats. 1877, ch. 5, §§ 2, 3, p. 3.)
The next two advisory ballot measures were presented to the statewide voters in 1892. One implicated the Legislature’s article V role—it sought the electorate’s views concerning whether the federal Constitution should be amended (as it eventually was, more than two decades later) to provide for direct election of United States senators. That advisory measure required, again similarly to the one at issue here, that the result of the balloting be conveyed to Congress. (Stats. 1891, ch. 48, § 3, p. 46.) The second advisory measure of that year asked whether the ability to read and write in English should be a requirement for voting in the state. (Stats. 1891, ch. 113, pp. 704-705.)
As explained in the majority opinion (ante, at p. 508), in 1909, and again in 1911—both prior to adoption of the Seventeenth Amendment to the federal Constitution—our Legislature, like those in numerous other states, asked voters to give their advice at the ballot box concerning which candidate the Legislature should appoint as United States senator. (Stats. 1909, ch. 405, § 2, p. 691; Stats. 1911, ch. 387, § 1, p. 705.) And in 1933, the Legislature posed to the statewide electorate two advisory ballot questions concerning the use of gasoline tax funds. (Stats. 1933, ch. 435, pp. 1125-1126.)
B. Other states’ submission of advisory measures to their statewide electorates
Dating initially from the late 1700s, and with growing use in the mid-1800s, the legislatures of other states have sought the advice of their statewide voters on all kinds of matters unconnected with any article V issue *526 and yet within the legislature’s authority to act—ranging from whether to allow the establishment of banks, to abolition of forced labor by prisoners, to suffrage for women. (Goldman, The Advisory Referendum in America (1950) 14 Pub. Opinion Q. 303, 305-308 (hereafter The Advisory Referendum) [describing the use of advisory measures in colonial times and in statewide 19th-century ballot measures in Mass., Ala., Wis., Nev., and N. Y.].[1])
The use of such advisory and nonbinding ballot measures has continued nationwide in the intervening decades. For example, the Massachusetts Legislature put 12 advisory measures on the ballot from 1919 to 1998, and the Wisconsin Legislature placed 20 such measures on the ballot between 1948 and 1995. (Zimmerman, The Referendum (2001) p. 62.)
Focusing only on the most recent four decades, advisory measures wholly unconnected with any article V role have been placed on the statewide ballot by 12 state legislatures, all of which operate under constitutions similar to California’s, in that none contains any provision specifically authorizing such legislative action. These most recent examples of statewide ballot measures have posed to the statewide voters the following policy questions addressing myriad issues coming within the legislature’s authority to act.
Alaska: Should the legislature propose an amendment to the state constitution prohibiting the state from providing employment benefits to same-sex partners of public workers? Should a portion of the Alaska Permanent Fund be used to balance the state budget? Should the legislature revise the state’s annuity program by adopting a longevity bonus for those 65 and older? Should the Legislature adopt a resolution placing before the voters an amendment to the state constitution calling for regular legislative sessions to be 120 days long with the possibility of a 10-day extension upon a majority vote?[2]
*527 Delaware: Do the voters favor allowing the state to license various charitable organizations to sponsor and conduct lotteries under certain conditions? Do the voters favor state regulated and controlled slot machines?[3]
Idaho: In light of the fact that the United States Supreme Court ruled that the state’s term limits law does not apply to members of Congress, should that law continue to apply to state elective offices? Should the state maintain previously adopted property tax relief, reducing property taxes and protecting funding for public schools, by keeping the sales tax at 6 percent?[4]
Illinois: Should any health insurance plan that provides prescription drug coverage be required to include prescription birth control as part of that coverage ? Should the state increase its minimum wage to $10 per hour by a certain date ? Should the Illinois Constitution be amended to require that each school district receive additional revenue, based on its number of students, from an additional 3 percent tax on income greater than $1 million?[5]
Massachusetts: Should taxpayer money be used to fund political campaigns for public office? Should the commonwealth require that radio and TV broadcast outlets give free equal time to all candidates running for public office? Should the commonwealth change the legal age for consuming alcohol from 21 to 18? Should voluntary recitation of prayer be authorized in the commonwealth’s public schools?[6]
*528 Nevada: Should the state designate the third to last Friday in October as a new Nevada Day holiday, replacing a holiday long declared by the Legislature to fall on October 31?[7]
Oregon: Should the state change the system for funding public schools in various ways specified in a menu of options, concerning income, property, and sales taxes, presented in four separate advisory measures?[8]
Vermont: Should the legislature consider enactment of a lottery to supplement state revenues? Should the state hold a constitutional convention?[9]
Wisconsin: Should the death penalty be enacted in the state for cases involving first degree intentional homicide if the conviction is supported by DNA evidence? Do the voters favor restrictions on gambling, or new forms of gambling, or continuation of existing forms of gambling, as described in five separate advisory measures? Should local control over vocational, technical and adult education be changed to state control, with funding paid out of state tax revenues, instead of principally from local property tax revenues? Do the voters favor greater state aid to municipalities for accelerated water pollution abatement facilities through the issuance of bonds? Do the voters favor expanding state acquisition and development of land for recreational purposes through the issuance of bonds ?[10]
*529 Less frequently during the same most recent four decades, legislatures nationwide also have continued to exercise their traditional powers by seeking the advisory views of the electorate concerning, not a possible law or state constitutional amendment, but instead connected with the legislature’s authority to issue policy resolutions directed toward the federal government.
For example, federal environmental issues have been the subject of advisory questions in at least four states. The North Carolina Legislature asked voters if they were “for” or “against” location of a radioactive waste facility in the state, and directed that the results of the ballot be shared with the President, Congress, and other federal officials. Likewise, the Oregon Legislature asked: Should state officials continue challenges to federal selection of the state to house high-level nuclear waste repositories? The Wisconsin Legislature asked: Do voters support construction of a national or regional high-level radioactive waste disposal site in the state? The Massachusetts Legislature asked: “Shall the Commonwealth urge the President . . . and . . . Congress to enact a national acid rain program” requiring specific reductions in total national sulfur dioxide and allocate the costs of reductions equitably among the states?[11]
Concerning the federal government’s military policies, the legislature of Massachusetts in 1970 polled its voters regarding “the future course of action by the United States in Vietnam,” asking whether military victory, withdrawal pursuant to a “planned schedule,” or immediate withdrawal was preferable.[12] Thereafter, in 1982 the legislatures of three states—New Jersey, Rhode *530 Island, and Wisconsin—asked their voters whether the state should inform the President and Congress that the people desired a negotiated international nuclear weapons moratorium and arms reduction.[13]
Regarding the federal government’s role in legislating concerning health care, the Massachusetts and New Jersey Legislatures each asked voters: Should the state urge Congress to enact a national health care program?[14]
C. Nationwide and in California: Advisory measures submitted to voters by local legislatures (county boards and city councils)
Nationwide, the use of legislative advisory ballot measures to ask voters similar policy questions is even more frequent at the level of local legislatures—county boards of supervisors and city councils. (See Ballotpedia, <http://ballotpedia.org/Advisory_question> [as of Jan. 4, 2016] [“Advisory questions are most commonly used at the local level, often to voice the opinions of [the] region to higher levels of government.”].) Cities have made use of such advisory measures since the late 19th and early 20th centuries. (See, e.g., Zimmerman, The Referendum, supra, at p. 140 [describing such measures in New York City, Buffalo, Chicago, and Wilmington]; Crouch, Municipal Affairs: The Initiative and Referendum in Cities (1943) 37 Amer. Poli. Sci. Rev. 491, 492, 501 (hereafter Referendum in Cities) [observing that “[m]any city councils have made use of . . . the advisory referendum, or ‘straw vote’ ” advisory ballot, and noting that between 1910 and 1938, 32 such measures were submitted to the voters in Detroit].)
Local legislatively initiated advisory ballot measures in California reflect a similar pattern. Prior to 1940, and even though there was at that time no explicit constitutional or statutory authority for doing so, advisory policy measures often appeared on the ballot in Los Angeles and San Francisco. (See Referendum in Cities, supra, 37 Amer. Poli. Sci. Rev. at pp. 492, 501 [noting 46 “[p]ublic [p]olicy [referenda” on the L.A. ballot, and 21 on the S.F. ballot].) Eventually, in 1976, the Legislature specifically codified and *531 acknowledged the propriety of advisory measures placed on the ballot by local legislative entities, including county boards of supervisors and city councils. Elections Code section 9603, subdivision (a), expressly contemplates advisory measures to allow “voters within the jurisdiction, or a portion thereof, to voice their opinions on substantive issues, or to indicate to the local legislative body approval or disapproval of the ballot proposal.” Counted from 1995, the most recent year for which data is readily available, there have been, in California alone, 184 such measures—mostly by cities, with others by counties—averaging more than nine statewide each year.
What has been the nature of these local advisory measures? They have mirrored the types of statewide policy inquiries described above, with a special focus on specific issues of local importance and within the local legislature’s authority to act. Typical have been, for example, questions concerning the conduct of local elections. The City of Modesto has asked its voters: Should city council members be elected by district, or at large? The City of Davis has asked: Should city council elections be conducted pursuant to “choice voting” (also known as “instant runoff’ or “preference” voting)? The City of Lancaster has asked: Should the city adopt an ordinance consolidating municipal elections with countywide school district elections ?[15]
Other measures have probed the voters’ policy preferences concerning a variety of miscellaneous local matters. The City of Milpitas has asked: Should the city council submit to the voters a proposal to revise the city charter in various ways, including enlarging the city council? The City of National City has asked: Should the city council establish a Citizens’ Police Oversight Commission? The City of South Gate has asked: Should the city council enact a permit system regulating the number of vehicles that may be *532 parked overnight? The City of Half Moon Bay has asked: Should the city adopt a policy of employing its powers of eminent domain only when the stated “public use” is not “primarily . . . based on the City’s desire for ‘increased City revenue’ ”? (2005 CEDA, city results, p. 23.)[16]
Many other advisory measures have addressed housing, development, and related public service issues. For example, the City of San Diego has asked: Do the voters endorse development of up to 5,000 low-rent apartments and townhomes scattered throughout the city? The City of Modesto has asked: Should the city council expand sewer service to certain areas? Los Angeles County has asked: Should a new flood control district be formed, or should an existing area be annexed to a current county flood control district?[17]
*533 Numerous local advisory measures have inquired about specific land-related developments. For example, Siskiyou County has asked: Should certain river dams and associated hydroelectric facilities be removed? Imperial County has asked: Should the county create a new regional international airport to replace or augment the services provided by the county’s existing international airport? The City of Hawthorne has asked: Should certain public lands be sold to generate general or earmarked revenue?[18] Still others have asked about gaming and related issues. For example, the City of Calexico has asked: Should a local ordinance give a city authority to negotiate agreements with Native American tribes concerning development and operation of gaming and entertainment resorts?[19]
Local voters have been questioned about their policy views concerning prioritization of existing taxes and related revenues. For example, the City of Plymouth has asked: Should 2 percent of revenue from the increase in the transient occupancy tax be used to fund streets, parking, and landscaping, and should another 2 percent of that revenue fund events, signs and advertising for tourism promotion? Kings County has asked: Should revenue from new voter-approved sales taxes be used for specified local criminal justice system improvements? Tehama County has asked: Should tax proceeds funding police and fire services be distributed to the county and incorporated cities in proportion to their respective populations?[20]
*534 Likewise, some advisory ballot questions have accompanied substantive measures proposing to raise sales and related taxes. The City of Richmond has asked: If a business license fee on sugar-sweetened beverages passes, should revenues be used primarily to fund after-school sports programs, sports fields, healthier school meals, as well as medical and obesity care for indigent children? The City of South Pasadena has asked: If proposed local tax increases are approved, should at least 65 percent of the generated revenue be used for infrastructure improvements, and no more than 35 percent expended for city employee salaries?[21] The City of Arroyo Grande, noting that an ordinance measure imposing a one-half-cent sales tax to fund community needs was before the voters, presented a menu of ophons, asking in separate measures whether a porhon of increased funds should go to (a) upgrading a specific highway interchange? (b) specific city infrastructure maintenance needs? (c) police and fire services? (d) improvements to make city facilities more accessible to those with disabilities?[22]
*535 Finally, a few advisory ballot measures have concerned, not local policy issues, but instead—and analogously to the advisory measures underlying legislative resolutions described earlier—entreaties to the President and Congress regarding federal military policy.[23]
With this overview in mind, I turn to the question whether, as a general matter, the Legislature has authority to place an advisory measure on the statewide ballot.
II. The Legislature’s General Right to Inform Itself in Order to Consider Whether to Undertake Action
As the foregoing discussion demonstrates, over numerous decades legislative bodies have submitted advisory ballot measures to the voters in California and throughout the country. If such measures were constitutionally impermissible, one would have thought that objections would have been raised on numerous occasions throughout the last century and that we would find judicial decisions striking down such measures. But the parties have pointed to no such decision and independent research has uncovered none. Instead, the validity of such legislatively instigated advisory ballot measures has apparently been so well accepted that judicial challenges to such measures have been very rare and, as explained below, the few that have been filed have been rejected.
A. Prior actions and assumptions by the drafters of the 1879 Constitution and the voters who adopted it; early court decisions addressing challenges to advisory ballot measures; and scholarly commentary concerning the propriety of advisory measures
As an initial matter, it is important to recognize that the drafters of the 1879 Constitution—the version of the charter that, as revised in 1966, remains operative today—assumed that under it, the Legislature had power to place an advisory measure upon the statewide ballot in order to acquire the official views of the electorate on a question of policy that was completely unrelated to any effort to amend the federal charter. Moreover, it is clear that the electorate that approved the charter assumed that the Legislature had authority to present such a measure for the people’s vote.
As observed ante, part I.A., by statute in 1877 the Legislature placed an advisory measure on the September 1879 general election ballot, asking the *536 voters whether they were “ ‘[f]or’ ” or “ ‘[a]gainsf ” Chinese immigration. In the interim, a state constitutional convention had been called and was held in the closing months of 1878 and early 1879 (1 Willis & Stockton, Debates and Proceedings, Cal. Const. Convention 1878-1879 (Willis and Stockton)), at which the subject of Chinese immigration was a major focus. During the course of those debates the delegates, essentially all of whom expressed virulent and racist views on the issue (see, e.g., 1 Willis & Stockton, at pp. 627-640; 2 Willis & Stockton, at pp. 641-662, 663-692, 695-702), explicitly discussed the impending advisory ballot measure. The existence and assumed propriety of that impending measure was instrumental in derailing a proposed constitutional provision expressly barring such immigration; the delegates instead were content to let the electorate speak on the issue via the upcoming advisory ballot measure.[24] Accordingly, when the Legislature’s advisory measure was finally presented to and acted upon by the voters in September 1879, just a few months after they had approved the new Constitution itself in May of that same year, the electorate voted on that advisory measure with the blessing of the constitutional delegates, who obviously assumed that the Legislature possessed and retained authority to submit such an advisory measure to the statewide voters. Nor is there any reason to believe that the electorate, having voted their approval of the new charter only months earlier, had any basis to suspect that under it, the Legislature lacked authority to have the people vote on that September 1879 advisory ballot measure.[25]
The few early lawsuits challenging advisory measures were rebuffed. As mentioned earlier, in both 1909 and 1911 our Legislature, like those in numerous other states, again posed advisory measures to the electorate, seeking its advice concerning which candidate the Legislature—at that time possessing the power to appoint the state’s United States senators— should appoint to that position. (Stats. 1909, ch. 405, § 2, p. 691; Stats. 1911, ch. 387, § 1, p. 705.) As the majority observes, when the 1909 enactment *537 placing this question on the 1909 primary election ballot was challenged as violating the Constitution’s “one subject” rule in Socialist Party v. Uhl (1909) 155 Cal. 776 [103 P. 181], we upheld the statute, and commented: “There is nothing in the constitution . . . which prohibits the legislature from providing at a primary [election] for an expression of a choice as to a candidate for United States senator. It is within the general legislative power to do so . . . .” (Id., at p. 782.)
The South Dakota Supreme Court had reached a consistent conclusion 14 years previously in State ex rel. Cranmer v. Thorson (1896) 9 S.D. 149 [68 N.W. 202] (Cranmer), upholding the validity of a legislative advisory ballot measure outside the article V context. The South Dakota Legislature sought to pose a question to its statewide voters concerning whether a provision of the state charter, establishing Prohibition within the state, should be repealed. (Cranmer, 68 N.W. at p. 202, citing 1895 S.D. Sess. Laws p. 39.) A prospective voter, arguing that the ballot measure as phrased was not itself a proposed amendment, but instead a mere question seeking the electorate’s nonbinding policy views about a possible future amendment, sought— similarly to petitioners in the present case—to enjoin the defendant secretary of state from placing such an advisory measure on the ballot. The state Supreme Court rejected that challenge, explaining that even if the measure sought merely the voters’ advice and not their actual determination of the ultimate issue, the court was aware of “no law prohibiting the legislature from submitting any question its wisdom may suggest.” (68 N.W. at p. 202, italics added.) Regarding the challenger’s contention that the measure, as phrased, posed only a policy query to the voters, and that “the constitution will not be changed whatever reply may be returned” (ibid.), the court stated that the legislature was perfectly free to “submit a question not intended to change the organic law” (ibid.), and concluded that the legislature “has done what it had a right to do” (id., at p. 203). To determine otherwise and take the matter off the ballot, the court wrote, “would disturb the system of checks and balances which the constitution has so carefully constructed.” (Id., at p. 204; see also Wyatt v. Kundert (S.D. 1985) 375 N.W.2d 186, 191 [acknowledging the legislature’s power to pose advisory “questions to a vote of the electors” on the statewide ballot];[26] accord, Southeastern Michigan Fair *538 Budget Coalition v. Killeen (1986) 153 Mich.App. 370 [395 N.W.2d 325, 330] [“the Legislature can do anything which it is not prohibited from doing” and may “place advisory questions on the ballot and . . . empower subordinate governmental entities to do so” as well].)
Scholars have long reached the same conclusion. More than 100 years ago, after describing some of the advisory policy measures mentioned above, Ellis Paxson Oberholtzer observed: “There is nothing, it would seem, that could prevent the legislature from resolving to ask the people for advice” by posing questions on the statewide ballot. (Oberholtzer, The Referendum in America (1911) p. 208 (hereafter The Referendum in America); see Lowell, The Referendum in the United States in The Initiative, Referendum and Recall (Munro edit., 1912) p. 134 [noting that a legislature “can, of course, consult” “the electors” “by means of an informal vote”].) More recently, Markku Suksi echoed those earlier observations: “[T]here seems to be nothing that would prevent a state legislature from organizing an advisory referendum” or ballot measure. (Suksi, Bringing in the People: A Comparison of Constitutional Forms and Practices of the Referendum (1993) p. 89 (Bringing in the People).)
B. Nothing in the majority opinion ’s analysis, or in fundamental legal principles that guide this analysis, supports a conclusion that advisory measures are confined to the article V context
The majority’s legal analysis, recognizing that the Legislature’s legislative authority is plenary and there is nothing in the California Constitution that precludes the Legislature from placing an advisory measure on the ballot, itself supports the conclusion that no constitutional principle confines advisory measures to the article V context.[27] In this regard, four of the fundamental legal principles alluded to in the majority opinion bear repeating here.
First and foremost: The California Legislature’s legislative power, unlike that of Congress under the federal Constitution, is plenary. As explained in hornbook passages of numerous decisions, the Legislature enjoys “all the powers and privileges which are necessary to enable it to exercise in all respects, in a free, intelligent and impartial manner, its appropriate functions, *539 except so far as it may be restrained by the express provisions of the Constitution, or by some express law made unto itself, regulating and limiting the same.” (Ex parte D. O. McCarthy (1866) 29 Cal. 395, 403.) Moreover, “ ‘our Constitution is not a grant of power but rather a limitation or restriction upon the powers of the Legislature’ ”—and we do not look to it in order “ ‘ ‘“to determine whether the Legislature is authorized to do an act, but only to see if it is prohibited.” ’ ” (Dean v. Kuchel (1951) 37 Cal.2d 97, 100 [230 P.2d 811].)[28]
Second: An essential attribute of the legislative function is the “ ‘determination and formulation of legislative policy.’ ” (Carmel Valley Fire Protection Dist. v. State of California (2001) 25 Cal.4th 287, 299 [105 Cal.Rptr.2d 636, 20 P.3d 533].) ‘“In fact it could be said that policymaking is the legislative function.” (Schabarum v. California Legislature (1998) 60 Cal.App.4th 1205, 1219 [70 Cal.Rptr.2d 745].) The Legislature’s determination of policy comes into play not only with regard to its traditional lawmaking function, but also with regard to its traditional function concerning the issuance of resolutions reflecting a majority vote of each house, expressing approval or disapproval of legislation pending or proposed in Congress, or regarding programs or activities of the federal government.[29] This resolution power has been long employed by the California Legislature and those of other states in numerous and widely varied contexts.[30]
*540 Third: The Legislature possesses powers that are necessary, incidental, and “ancillary to the ultimate performance of [its] lawmaking functions.” (Parker v. Riley (1941) 18 Cal.2d 83, 89 [113 P.2d 873].)[31] In this regard the Legislature needs to be able to obtain information supporting policy determinations that underlie any statutory law or resolution that it considers.
Fourth and finally: “The presumption which attends every act of the legislature is that it is within the constitutional power”—and this “presumption . . . holds good until it is made to appear in what particular it is violating constitutional limitations.” (Macmillan Co. v. Clarke (1920) 184 Cal. 491, 496-497 [194 P. 1030].) “ ‘If there is any doubt as to the Legislature’s power to act in any given case, the doubt should be resolved in favor of the *541 Legislature’s action. [Any] restrictions and limitations are to be construed strictly, and are not to be extended to include matters not covered by the language used.’ . . . [Citations.] Specifically, the express enumeration of legislative powers is not an exclusion of others not named unless accompanied by negative terms.” (Dean v. Kuchel, supra, 37 Cal.2d 97, 100, italics added by Dean.) In other words, ‘“all intendments favor the exercise of the Legislature’s plenary authority.” (Methodist Hosp. of Sacramento v. Saylor (1971) 5 Cal.3d 685, 691 [97 Cal.Rptr. 1, 488 P.2d 161].)
C. Summary and conclusions concerning use of ballot measures to inform the Legislature regarding issues of policy
As demonstrated earlier, advisory ballot measures have long been used by our Legislature, those of other states, and local legislatures, to obtain information to inform the legislative body about possible laws or resolutions. As observed more than 75 years ago, even when the ultimate decisionmaking power remains with the ‘“presumably technically more qualified . . . legislature” (whose members retain and employ ‘“full power to act independently, whether it be in accordance with or against the wishes of the people”), an advisory ballot measure is a useful device for securing “authoritative popular participation in public policy-making upon a non-legislating basis” and “facilitating communication between the electorate and its representatives.” (The Advisory Referendum, supra, 14 Pub. Opinion Q. at pp. 304, 315.)
For similar reasons, nearly 40 years ago Chief Justice Rehnquist approved the same kind of advisory communication between the electorate and its representatives in Kimble v. Swackhamer (1978) 439 U.S. 1385 [58 L.Ed.2d 225, 99 S.Ct. 51]. As the majority observes (maj. opn., ante, at pp. 510-511), in that matter, acting as circuit judge, then Associate Justice Rehnquist refused to remove from the Nevada ballot an advisory measure submitted by the state legislature, seeking the electorate’s views on the proposed Equal Rights Amendment. Justice Rehnquist explained that he would be “most disinclined” to read the high court’s prior cases or the federal Constitution “as ruling out communication between the members of the legislature and their constituents. If each member of the Nevada Legislature is free to obtain the views of constituents in the legislative district which he represents, I can see no constitutional obstacle to a nonbinding, advisory referendum of this sort.” (Kimble, at pp. 1387-1388, italics added; see also Kimble v. Swackhamer (1978) 94 Nev. 600 [584 P.2d 161] [rejecting challenges to the advisory measure in the face of a dissenting justice who suggested that the legislature had no authority under the state Constitution to submit such a ballot measure to the voters].)
*542 As these sources, combined with the California constitutional history, cases and authorities addressing advisory measures, and myriad examples of advisory measures discussed above suggest—and in light of the guiding principles mentioned earlier, including the Legislature’s plenary authority, its core role in shaping and articulating policy, and the deference that we afford to the Legislature’s determination of its exercise of power—it follows that the Legislature may inform itself by enacting a statute that places an advisory question on the ballot in order to obtain the voters’ policy views with regard to any potential action that the Legislature has authority to undertake. Whether the legislative body proceeds by posing a list of interrogatory policy questions to the electorate, or, as most often, a single, straightforward question, the goal is the same: to inform itself about the policy preferences of the voters relating to a matter upon which the legislative body has authority to act. And in pursuing this information-gathering goal by placing an advisory ballot measure before the voters concerning such a matter—whether related to its article V role, its general lawmaking function, or its power to issue resolutions—a legislative body acts reasonably and within its powers.
Nor do I perceive any reason to question, as a general matter, either the efficacy or the prudence of this form of information gathering by a legislative body. As the majority observes, ‘“[i]n a representative democracy, legislators are generally expected to be responsive to their constituents.” (Maj. opn., ante, at p. 517.) In this regard, recent empirical scholarship suggests that in practice, the use of advisory measures is efficacious, providing pertinent information to a legislative body, and that legislative bodies have employed the information obtained from results of advisory ballot measures when deciding whether, and how, to undertake actions reasonably within their own powers. A study of local advisory ballot measures in California revealed that county boards and city councils complied with the advice of the voters more than 80 percent of the time—while still exercising, of course, prudence and measured discretion to disagree and depart from that advice as appropriate. (Ely, Government by Advice: Public Participation and Policymaking Through Advisory Ballot Measures (2015) 47 St. & Local Gov’t Rev. 92, 97, 99 (hereafter Government by Advice).)[32]
*543 Finally, returning to a point alluded to at the start of this discussion, ante, part II.A.: There is no evidence that the Constitution, as amended in 1966, was intended to restrict, remove or preclude the Legislature’s power to pose advisory ballot questions to the electorate. As noted earlier, the legislative article of the Constitution, as debated and adopted in 1879, was animated by the drafters’ and the electorate’s assumptions that the Legislature had power to submit an advisory ballot measure unconnected with article V to the statewide voters. That 1879 version of the Constitution remained in place, with amendments not relevant here, until the 1960s, when at the behest of the Legislature, the California Constitution Revision Commission (Commission) undertook to review and eventually to recommend numerous revisions to the charter’s legislative article.[33] The voluminous record (working papers, drafts, reports, and transcripts)[34] of the resulting 1966 revisions reveals that the Commission drafters, as well as the Legislature, its committees, and the Legislative Analyst—with all of whom the Commission coordinated its *544 proposed changes—accepted as a fundamental guiding principle the proposition that the Legislature possesses plenary authority, and hence has all powers except as expressly limited in the charter itself. (See, e.g., Robbins, Revision of Article IV of the California Constitution (1965) p. 2 [study by Commission staff attorney] (hereafter Revision of Article IV).)[35]
Moreover, the Commission advanced its “[proposals involving substantive change . . . only after especially detailed examination and only in instances where the change [was] needed and [would] promote a smoother-running state government.” (Revision of Article IV, supra, at p. 3.) A searching review of the extensive revision documents has found nothing to suggest any intent by the Commission or anyone else to restrict, remove or preclude the Legislature’s power, as assumed by the drafters of the 1879 charter and voters who enacted it—and as illuminated by the history, cases and commentary discussed above—to place advisory policy measures, even those completely unconnected with any article V issue, on the statewide ballot.
For reasons set out above, when the Legislature in 2014 enacted the challenged statute posing to the statewide voters the advisory policy questions set out in Proposition 49, it performed well within its authority to inform itself concerning possible action that it might take regarding matters reasonably within its powers.
Moreover, and again for reasons set out above, it is important to avoid any implication that advisory ballot measures are proper only in connection with a legislative body’s exercise of its functions under article V of the federal Constitution. Such a narrow view of legislative authority would find no *545 support in any case or secondary source; it would conflict with the few but long-established judicial decisions that have rejected challenges to such legislative authority; it would necessarily imply the invalidity of myriad past advisory statewide ballot measures both in California and the other jurisdictions described earlier; likewise it would mean that all such measures previously submitted to the voters by local legislative bodies (county boards and city councils)—many hundreds in California alone in just the last four decades—were invalid and that the procedure may never again be employed to secure the people’s views; and it would confine any future advisory ballot measure to the distinct subset of measures concerning possible amendment to the federal Constitution. Fortunately for the cause of full discourse and communication between our elected representatives and the people in our democracy, that is not the law.
III. Contrary to Petitioners’ Contention, the Structure of the California Constitution and Its Republican Form of Government Do Not Pose Accountability Concerns That Preclude the Legislature from Placing an Advisory Measure on the Ballot
Because petitioners have, in their briefing, argued that the structure of our constitutional scheme, our republican form of government, and concerns regarding accountability, all militate against recognizing the validity of advisory ballot measures, we must address those claims now. The majority opinion rejects these contentions by explaining, as an initial matter, that under our existing system of representative democracy “lines of accountability are inevitably blurred to some extent.” (Maj. opn., ante, at p. 517.) Moreover, as the majority opinion observes, the people’s “right to instruct their representatives,” set out in the California Constitution, article I, section 3, subdivision (a), itself also blurs lines of accountability, and is inconsistent with petitioners’ view that the state charter implicitly prohibits the Legislature’s use of advisory ballot measures. (Maj. opn., ante, at pp. 517-518.)[36] I agree on both scores, but I believe it is prudent and useful to flesh out petitioners’ structural *546 claims in slightly more detail and also to set out additional reasons why I conclude their assertions hnd no support in history, case law, or logic.
Petitioners argue that the people’s creation of direct democracy rights in 1911 by necessary implication divested the Legislature of power to place advisory measures on the statewide ballot. They contend: ‘“[T]he legislative power is shared by the people and the Legislature. This power to enact law is essentially Wo sides of the same coin.” (Italics added.) They assert that this court must protect both the people, in their exercise of the initiative power, and the Legislature, in the exercise of its own powers, against “encroachment and interference by the other.” Applying these principles in the present context, petitioners claim, in essence, that when the people obtained direct democracy rights to make law in 1911, by implication they also necessarily and simultaneously stripped the Legislature of any power it previously had under the prior iterations of the Constitution to pose advisory questions to the statewide voters. This would have surprised the people who voted for these reforms more than 100 years ago, and this conclusion would be stunning today.
As observed earlier, prior to adoption of the initiahve and referendum as part of the California Constitution in 1911, the Legislature had hve times exercised its authority to place advisory measures on the statewide ballot in order to determine the voters’ views on issues of public import concerning matters within the Legislature’s power to act. In fact, as explained earlier, the Legislature’s right to pose an advisory ballot queshon unconnected with any article V issue was assumed by the drafters of the 1879 Constitution, and necessarily by the electorate who adopted it as well. (See ante, pt. II.A.) And as noted previously, in rejecting a single-subject-rule challenge to one of those enactments—providing that the voters should be asked at the primary election their advice about which candidate the Legislature should appoint as United States senator—this court upheld the statute, observing that nothing in the Constitution prohibits the Legislature from posing such a question on the ballot. (Socialist Party v. Uhl, supra, 155 Cal. 776, 782.) Although no other *547 judicial decision resulted regarding any of these early California advisory ballot measures (there was no other court challenge, most likely because, as suggested earlier, few doubted the Legislature’s authority to take such actions), both the history surrounding the drafting and adoption of the 1879 Constitution, and the early California constitutional precedents at that time clearly supported such broad authority. Our precedents recognized that, under the California Constitution, unlike the federal charter, the Legislature has plenary power to take actions unless expressly prohibited—and there was (and is) nothing in the California Constitution that prohibits the Legislature from soliciting the views of the voters on a matter of public concern through a ballot measure.
Neither was there in 1911, nor is there now, authority from any jurisdiction holding that a state legislative body lacks such power. To the contrary: as noted earlier, in 1896 the South Dakota high court had in Cranmer rejected a claim that its legislature had no power to place such a measure on the statewide ballot. The court concluded that it was aware of “no law prohibiting the legislature from submitting any question its wisdom may suggest,” and that the legislature was perfectly free to “submit a question not intended to change the organic law.” (Cranmer, supra, 68 N.W. at p. 202, italics added.) Consistently with that early decision, also as noted above, contemporaneous scholars addressing the burgeoning direct democracy movement found “nothing, it would seem, that could prevent the legislature from resolving to ask the people for advice” at the ballot box. (The Referendum in America, supra, at p. 208; see also Lowell, The Referendum in the United States in The Initiative, Referendum and Recall, supra, at p. 134.)
Nevertheless, petitioners suggest that by necessary implication, legislative power to pose advisory questions to the electorate must have been removed in 1911, when the people of California followed the lead of South Dakota, Oregon, and 10 other states, adding what is now article II, sections 8 and 9 of the Constitution, giving themselves the direct democracy rights of initiative and referendum. (See, e.g., People v. Kelly (2010) 47 Cal.4th 1008, 1032 & fn. 30 [103 Cal.Rptr.3d 733, 222 P.3d 186] [describing the early direct democracy movement].) And yet petitioners point to nothing in the language or history of the initiative and referendum provisions made part of the California Constitution that year (Voter Information Guide, Gen. Elec. (Oct. 10, 1911) text of Prop. 7, Sen. Const. Amend. No. 22, § 1, Stats. 1911, res. ch. 22, p. 1655) purporting to speak to the Legislature’s authority, or to restrict or preclude its power, by implication or otherwise, in any manner. There is simply no support for the view that, by granting to the people initiative and referendum power in 1911, there was any implied intent to limit or bar the Legislature’s *548 authority, which as noted earlier was assumed by all with regard to the 1879 charter, to pose advisory questions to the voters.[37]
The same “necessary implication” argument now advanced by petitioners (that the creation of direct democracy rights itself removed the Legislature’s power to pose advisory ballot measures) was raised and rejected—once more by the South Dakota Supreme Court—this time in its 1985 decision in Wyatt v. Kundert, supra, 375 N.W.2d 186. In the face of a majority opinion acknowledging the legislature’s authority to pose advisory “questions to a vote of the electors” on the statewide ballot (id., at p. 191), a dissenting justice argued that such power had been necessarily and implicitly withdrawn when the state constitution was subsequently amended to grant the people initiative and referendum power (id., at p. 198 (dis. opn. of Wuest, J.)). The majority rebuffed that contention, explaining that the South Dakota Constitution’s direct democracy provision “has not removed the legislature’s inherent referral power and the restrictions imposed by and through [the state charter’s direct democracy provision] apply only to referendums of the people and not to a referendum by the legislature.” (375 N.W.2d at p. 191; see also the Michigan appellate court decision in Southeastern Michigan Fair Budget Coalition v. Killeen, supra, 395 N.W.2d 325, 330 [the legislature may place advisory policy questions on the statewide ballot and empower local governmental entities to do so as well].) As noted earlier, this state of affairs led a 1993 scholarly study to conclude that nothing appears to prevent a state legislature from placing an advisory measure on the statewide ballot. (Bringing in the People, supra, at p. 89.)
Neither does petitioners’ hypothesized implied limitation on the Legislature’s authority find support in logic. The notion that the people, in enacting their direct democracy rights to propose and actually adopt statutes and state constitutional amendments, also necessarily (but only implicitly) intended to preclude the Legislature from posing advisory questions to the voters, is at best counterintuitive.
Nor do I find persuasive petitioners’ corollary argument that the initiative process, once enacted, became, and remains, the sole province of the electorate—and that it contemplates no involvement by the Legislature. They assert in their reply brief that “the basic structure of the Constitution . . . indicates that there is a clear line drawn between the lawmaking function of the Legislature on one hand, and the [initiative] powers reserved to the people on the other hand.” That unsupported assertion is dubious as a matter of *549 constitutional law and history. It also is in tension with the recently enacted Ballot Initiative Transparency Act of 2014 (Stats. 2014, ch. 697), which reveals that the Legislature itself contemplates that it does indeed have an important role to play by working with initiative proponents to enact statutes that were originally proposed as statutory initiatives, derailing a proposed initiative that was otherwise headed for the statewide ballot.[38]
In conclusion, petitioners’ various structural objections underlying their assertions that the state charter implicitly bars advisory ballot measures do not come close to satisfying the standards of deference, clarity, and strict construction that, as explained in the decisions cited ante, part II.B., we adhere to when deciding whether a power is, by necessary implication, denied to the Legislature. The historical employment of the power to submit advisory ballot measures by our Legislature and local California legislative bodies, as well as state and local legislative bodies in other states, would render our acceptance of petitioners’ structural challenge to the Legislature’s action at this late stage all the more striking. (Schabarum v. California Legislature, supra, 60 Cal.App.4th at p. 1218 [cautioning against interpretation that raises significant separation of powers issue].)[39]
*550 IV. Conclusion
For the forgoing reasons, and with the caveat that nothing in today’s decision should be viewed as calling into question the validity of statewide and local advisory ballot measures that are unrelated to any proposed amendment to the federal Constitution, I concur in the majority’s opinion and disposition.

 The author explained: A 1797 Massachusetts advisory ballot measure concerned whether to call a state constitutional convention; an 1819 Alabama advisory measure concerned whether to ratify an amendment to the state constitution; an 1847 Wisconsin measure concerned whether to allow or prohibit banks in the state; an 1879 Nevada measure, like the similar California ballot measure mentioned above, concerned whether to ban Chinese immigration; an 1883 New York measure concerned whether to abolish forced labor by prisoners; and another Massachusetts advisory ballot measure in 1895 concerned suffrage for women. (The Advisory Referendum, supra, 14 Pub. Opinion Q. at pp. 306-308.)

 Advisory election (Apr. 3, 2007) on benefits for same-sex partners of public employees (2006 Alaska Sess. Laws, ch. 1, 4th Special Sess.): voters answered no, according to data presented on Ballotpedia (ballotpedia.com; results of statewide elections described below and through fn. 23 are from the same source or from reports maintained by the particular state); advisory election (Sept. 14, 1999) on permanent fund (1999 Alaska Sess. Laws, ch.l, 1st Special Sess.): voters answered no; advisory vote on longevity annuity option, general election ballot (Nov. 4, 1986), Measure No. 3: voters answered yes (Inter-university Consortium for Political and Social Research, Referenda and Primary Election Materials (1994) pt. 49, p. 64); advisory vote *527 on legislative session length, general election ballot (Nov. 7, 1978), Proposition No. 1 (1978 Alaska Sess. Laws, ch. 98, Sess. Law No. 78, 2d Sess.): voters answered yes.

 Advisory referendum (Nov. 6, 1984, election) on lotteries by charitable organizations (64 Del. Law 955): voters of the four targeted counties answered yes; advisory referendum (Nov. 2, 1976, election) on slot machines (60 Del. Laws 1138): voters of the three targeted counties answered no.

 Advisory ballot (Nov. 3, 1998, election) on whether to retain state term limits (submitted by 1998 Idaho Sess. Laws 824): the voters answered yes; advisory ballot (Nov. 6, 2006, election) on retaining the property tax (submitted by 2006 Idaho Sess. Laws 36): the voters answered yes.

 The “Women’s Health Referendum Act” required a statewide advisory public question (Nov. 4, 2014, election) on birth control in prescription drug coverage (2014 Ill. Laws, Pub. Act 98-696, 98th Gen. Assem.): the voters answered yes; the “Minimum Wage Increase Referendum Act” submitted an advisory public question on the same ballot (Nov. 4, 2014, election) (2014 Ill. Laws, Pub. Act 98-657, 98th Gen. Assem.): the voters answered yes; the “Tax for Education Referendum Act” submitted another statewide advisory public question (Nov. 4, 2014, election) concerning tax on income over $1 million (2014 Ill. Laws, Pub. Act 98-794, 98th Gen. Assem.): the voters answered yes

 Legislative advisory question on taxpayer funding for political campaigns (Nov. 5, 2002, election). Question No. 3 (2002 Mass. Acts 660): the voters answered no; legislative advisory question on television and radio time for candidates (Nov. 6, 1990, election). Question No. 6 (1989 Mass. Acts 732): the voters answered yes; legislative advisory question on lower drinking age (Nov. 7, 1972, election). Question No. 8 (1972 Mass. Acts 74): the voters *528 answered yes; legislative advisory question on prayer in schools (Nov. 7, 1972, election). Question No. 9 (1972 Mass. Acts 479): the voters answered yes.

 Nevada Day advisory question (Nov. 3, 1998, election). Question 4 (1997 Nev. Stat. p. 508): the voters answered yes.

 Modification of school finance system, advisory ballot measure. Measure No. 5A (May 15, 1990, statewide ballot). This and four companion advisory measures. Measure Nos. 5B through 5E, were authorized by 1989 Oregon Laws 2214, and were presented on the ballot as a menu of options. The voters answered yes, they wanted to change the current system for funding K-12 schools, but they advised against each of the four proposed options for doing so.

 State lottery question (Nov. 2, 1976, election) (1976 Vt. Acts & Resolves 372): the voters answered yes; constitutional convention question (June 3, 1969, election) (1969 Vt. Acts & Resolves 202): the voters answered no.

 Death penalty advisory (Nov. 7, 2006, election) Question No. 1 (2005 Wis. Sess. Laws 1807; Wis. Sen.J.Res. No. 5): the voters answered yes. Regarding the gambling measures (1991 Wis. Sess. Laws 1783), all were submitted to state voters on the April 6, 1993, statewide ballot, as Questions 1 through 5. Question 1, concerning gambling casinos on excursion vessels, asked, “Do you favor a law that would allow gambling casinos on excursion vessels operating in this state on the Mississippi River, Lake Michigan and Lake Superior?” (the voters answered no); Question 2, concerning restriction of gambling casinos, asked, “Do you favor a constitutional amendment that would restrict gambling casinos in this state?” (the voters answered yes); Question 3, concerning video poker and video gambling, asked, “Do you favor a law that would allow video poker and other forms of video gambling in this state?” (the voters answered no); Question 4, concerning pari-mutuel on-track betting, asked, “Do you favor continuing to allow pari-mutuel on-track betting on races in this state, such as horse, dog *529 and snowmobile races?” (the voters answered yes); and Question 5, concerning the state-operated lottery, asked, “Do you favor continuing to allow the state-operated lottery?” (the voters answered yes).
The other Wisconsin referenda mentioned in the text above were posed at the April 1, 1969, election: to the question of state control and funding of vocational education (1969 Wis. Sess. Laws 1518), the voters answered no; to the question of water pollution control bonds (1969 Wis. Sess. Laws 1518), the voters answered yes; to the recreational lands question (1969 Wis. Sess. Laws 1518) the voters answered yes.
Advisory ballot policy measures have also been employed internationally. (See DuVivier, The United States as a Democratic Ideal? International Lessons in Referendum Democracy (2006) 79 Temp. L.Rev. 821, 847 [describing use in New Zealand, Denmark, Finland, Italy, Norway, Sweden, and the United Kingdom].)

 Regarding the radioactive waste disposal referendum (May 6, 1986, election) (1986 N.C. Sess. Laws 1), North Carolina voters answered “against”; concerning continuing challenges to federal selection for nuclear waste repositories (May 19, 1987, election). Measure 1 (1987 Or. Laws 17), Oregon voters answered yes; concerning the radioactive waste site question (Apr. 5, 1983, election) (1983 Wis. Sess. Laws 881), Wisconsin voters answered no; concerning the national acid rain program question (Nov. 4, 1986, election) Question 8 (1986 Mass. Acts 205), Massachusetts voters answered yes.

 Regarding the war in Vietnam (Nov. 3, 1970, election). Question No. 5 (1970 Mass. Acts 437), Massachusetts voters selected the middle option—withdrawal pursuant to a “planned schedule.”

 Freeze of nuclear arms escalation (Nov. 2, 1982, election). Public Question No. 1 (1982 N.J. Laws 79-81): New Jersey voters answered yes; referendum regarding nuclear armaments (Nov. 2, 1982, election) (1982 R.I. Pub. Laws 1415): Rhode Island voters answered yes; referendum on nuclear weapons moratorium and reduction (Sept. 14, 1982, election) Question No. 1 (1981 Wis. Sess. Laws 1710): Wisconsin voters answered yes. At least one other state legislature placed a similar measure on the statewide ballot via the state’s indirect initiative procedures: on the nuclear arms freeze initiative. Initiative No. 3 (Nov. 6, 1984, election) (1984 S.D. Sess. Laws 422), South Dakota voters answered no.

 Regarding the Massachusetts legislative advisory question on national health care. Question No. 7 (Nov. 4, 1986, election) (1985 Mass. Acts 568), voters answered yes; concerning New Jersey’s national health care referendum. Question No. 2 (Nov. 5, 1991, election) (1991 N.J. Laws 802), voters answered yes.

 The California Elections Data Archive (CEDA) is a compilation of candidate and ballot results for all local California elections, prepared as a joint project of the Center for California Studies and the Institute for Social Research, California State University, Sacramento, and the Secretary of State (Institute for Social Research, CEDA <http://www.csus.edu/isr/reports/ california_elections> [as of Jan. 4, 2016]; Cal. Secretary of State Web site. County, City, School District & Ballot Measure Election Results <http://www.sos.ca.gov/elections/county-city-school-district-ballot-measure-election-results> [as of Jan. 4, 2016]). For text and results of local measures listed through footnote 23, reference will be made to the relevant year’s CEDA compilation, by city or county results.
City of Modesto, Measure J (Nov. 6, 2007, election): voters answered “ ‘[b]y [district’ ” (2007 CEDA, city results, p. 23); City of Davis, Measure L (Nov. 7, 2007, election): voters answered yes (2006 CEDA, city results, p. 38); City of Lancaster, Measures A and B (Apr. 8, 2008, election): voters answered yes (2008 CEDA, city results, p. 26).
Likewise, other cities and counties have addressed local election rules: Should the city council call an election for the voters to decide whether the office of mayor should be elective, rather than appointed by the city council? (City of Moreno Valley, Measure O (Nov. 2, 2010, election): voters answered yes (2010 CEDA, city results, p. 31).) Should mailed ballots be used for all future general district elections? (San Bernardino County, Measure 1 (Aug. 30, 2011, election): voters answered yes (2011 CEDA, county results, p. 14).)

 City of Milpitas, Measure I (June 6, 2006, election): voters answered no (2006 CEDA, city results, p. 35) (the measure asked: “Should the Milpitas City Council place before the voters a charter city proposal that would require the following: (1) a budget reserve only for emergencies and not salaries, (2) voter approval of future capital projects over $15 million, (3) increase City Council from five to seven members, (4) an open recruitment process for top city management, (5) scheduled performance audits for all city departments, and (6) voter approval for city charter amendments?”); City of National City, Measure L (Nov. 5, 2002, election): voters answered yes (2002 CEDA, city results, p. 36); City of South Gate, Measure P (Apr. 5, 2005, election): voters answered no (2005 CEDA, city results, p. 20); City of Half Moon Bay, Measure O (Nov. 8, 2005, election): the voters answered yes (2005 CEDA, city results, p. 23).
Other representative local matters addressed questions such as: Should city council members’ compensation be increased 5 percent? (City of Burbank, Measure 1 (Apr. 10, 2001, election): voters answered yes (2001 CEDA, city results, p. 16).) Should the city replace its employees’ existing defined-benefit retirement plan with a defined-contribution plan? (City of Pacific Grove, Measure Y (Nov. 4, 2008, election): voters answered yes (2008 CEDA, city results, p. 30).)

 City of San Diego, Measure A (Nov. 5, 2002, election): the voters answered yes (2002 CEDA, city results, p. 36); City of Modesto, Measures N and O (Nov. 6, 2001, election): the voters answered yes (2001 CEDA, city results, p. 20); Los Angeles County, Measures J and K (Nov. 8, 2005, election): the voters answered no (2005 CEDA, county results, pp. 15-16).
Other similar measures have addressed the following questions: Should existing separate fire and police department buildings be consolidated into a single new building? (City of Sausalito, Measure B (Mar. 5, 2002, election): the voters answered no (2002 CEDA, city results, p. 28).) Should certain areas of the county remain official unincorporated communities, or should they be incorporated into a separate city? (L.A. County, Measures A & B (Nov. 3, 2009, election): voters answered yes to the first and no to the second (2009 CEDA, county results, p. 14).) Should the city council adopt an ordinance requiring removal of landscaping in order to restore and maintain primary views from private homes? (City of Malibu, Measure E (Apr. 8, 2008, election): voters answered yes (2008 CEDA, city results, p. 26).) Prior to transfer of ownership of a toxic Superfund site, should the county demand the Department of the Navy meet certain conditions, including thorough study, funding for remediation costs, identification of funds to reimburse the community for any contamination, and actual completion of site cleanup? (Orange County, Measure B (Nov. 5, 2002, election): voters answered yes (2002 CEDA, county results, p. 18).) If the water district implements fluoridation for some local users, should the prorated costs be passed on to those who receive the treated water? (Humboldt County, Measure B (Feb. 5, 2008, election): voters answered no (2008 CEDA, county results, p. 15).)

 Siskiyou County, Measure G (Nov. 2, 2010, election): voters answered no (2010 CEDA, county results, p. 19); Imperial County, Measure P (Nov. 8, 2005, election): voters answered yes (2005 CEDA, county results, p. 15); City of Hawthorne, Measure A (Nov. 6, 200E election): voters answered no (2001 CEDA, city results, p. 16) (the measure asked whether voters would support sale of local airport property to fund improvements to educational, police and fire programs, and to create new jobs). Likewise, when the City of San Juan Capistrano’s Measure DD (Nov. 5, 2002, election) asked voters whether they would support sale of more than 13 acres of city land to a private entity, they answered no (2002 CEDA, city results, p. 32).

 City of Calexico, Measure N (June 7, 2005, election): voters answered yes (2005 CEDA, city results, p. 17). Numerous similar subsequent local advisory measures have produced the opposite advice by voters. Regarding Yuba County’s Measure G (Nov. 8, 2005, election), voters answered no (2005 CEDA, county results, p. 18); concerning Glenn County’s Measure F (June 6, 2006, election), voters answered no (2006 CEDA, county results, p. 15); concerning the City of Richmond’s Measure U (Nov. 2, 2010, election), voters answered no (2010 CEDA, city results, p. 23); see also Colusa County, Measure D (June 6, 2006, election): voters agreed that the county should oppose local off-reservation Indian casinos (2006 CEDA, county results, p. 15); City of Petaluma, Measure H (Nov. 7, 2006, election): voters agreed that the city council should “take all lawful steps” to oppose gaming on specific local lands (2006 CEDA, city results, p. 37).

 City of Plymouth, Measure S (Nov. 6, 2012, election): voters answered yes (2012 CEDA, city results, p. 21); see also City of Plymouth, Measure P (Nov. 2, 2010, election): to the same question posed earlier, the voters also answered yes (2010 CEDA, city results, p. 22); Kings County, Measure A (Mar. 6, 2001, election): voters answered yes (2001 CEDA, county results, p. 14); Tehama County, Measure A (Nov. 11, 2004, election): voters answered no (2004 *534 CEDA, county results, p. 25). Similarly, the City of West Sacramento has asked: Should funding priority be given to building a new library, police facility, improving streets, public building access, after school programs, maintaining adequate reserves? (Measure J (Nov. 5, 2002, election): voters answered yes (2002 CEDA, city results, p. 41).)

 City of Richmond, Measure O (Nov. 6, 2012, election): voters answered yes (2012 CEDA, city results, p. 22); accord. City of El Monte, Measure C (Nov. 6, 2012, election): asked whether, if a business license fee on sugar-sweetened beverages passed, revenues should be used primarily for police and emergency services, as well as parks and recreation, and projects to treat childhood obesity, voters answered yes (2012 CEDA, city results, p. 25); City of South Pasadena, Measure AV (Nov. 6, 2007, election): voters answered yes (2007 CEDA, city results, p. 19).
Similar combined measures have asked: If voters approve a proposed measure increasing taxes, should those proceeds be used to fund only police and anti-gang operations, including drug resistance education and supervised after-school youth activities? (City of San Ber-nardino, Measure YY (Nov. 7, 2006, election): voters answered yes (2006 CEDA, city results, p. 31).) If voters approve a one-half cent sales tax increase, should half of the new revenues be spent “to restore services to the poor that have been cut due to State takeaways” and the other half on school programs “to restore educational services . . . eliminated due to State takeaways”? (City of Richmond, Measure C (June 7, 2011, election): voters answered yes (2011 CEDA, city results, p. 16).) If a sales tax measure is extended, should the proceeds fund a streetcar system and flood protection improvements? (City of West Sacramento, Measure U (Nov. 4, 2008, election): voters answered yes (2008 CEDA, city results, p. 39).) If voters were to approve a sales tax increase, should the additional revenues be used primarily for maintaining the city’s roadways? (City of El Paso de Robles, Measure F-12 (Nov. 6, 2012, election): the voters answered yes (2012 CEDA city results, p. 33).) If voters were to approve a half-cent sales tax increase, should the proceeds fund street repair', parks, libraries, after school programs, child and senior facilities, police and fire services, and reduction of utility and property tax assessments? (City of Whittier, Measure V (Nov. 5, 2002, election): voters answered yes (2002 CEDA, city results, p. 28).) If voters approved a utility tax increase from 10 to 12 percent, should that increased revenue fund “public safety services, including paramedic programs”? (City of Sierra Madre, Measure 12-2 (Apr. 10, 2012, election): voters answered yes (2012 CEDA, city results, p. 24).)

 City of Arroyo Grande, Measures K-06, L-06, M-06, N-06 (Nov. 7, 2006, election): voters answered yes to the first three, no to the last (2006 CEDA, city results, p. 33).

 See Mendocino County, Measure Y (Nov. 7, 2006, election), asking if voters supported ending military occupation in Iraq (2006 CEDA, county results, p. 17 [voters answered yes]); San Francisco City and County, Measure N (Nov. 2, 2004, election), asking a similar question—“[shall it be] city policy to urge the United States government to withdraw all troops from Iraq (2004 CEDA, county results, p. 22 [voters answered yes]).

 This movement was led by Mr. Rolfe, who argued against including the proposed immigration provision in the charter, proposing instead deference to the impending advisory vote: “[T]he last Legislature passed an Act submitting the question to the qualified voters of this State, to vote whether they are in favor or against Chinese immigration. Any gentleman may turn to the statutes and find it. They are called upon to vote for or against Chinese immigration. And upon the result of that the Governor and Secretary of State are to memorialize the President of the United States as to what that decision may be.” (2 Willis & Stockton, supra, at p. 703, col. 1.) Ultimately, the delegates agreed with Mr. Rolfe, narrowly passing a motion to strike the express provision bailing immigration. (Id., at p. 704, col. 1 [noting that the vote was 54 to 51 to strike]; see, e.g., 3 Willis & Stockton, at pp. 1493 [the article as reported by the committee on revision and adjustment], 1519 [as finally adopted].)

 The statewide voters, in line with the views of the convention delegates, overwhelmingly answered that they were “against” Chinese immigration. (See Certificate Announcing Results of Vote on Chinese Immigration Act (1879) online at Historical Society of Pennsylvania <http://digitalhistory.hsp.org/pafrm/doc/certificate-vote-act-ascertain-and-express-will-people-state-california-subject-chinese> [as of Jan. 4, 2016].)

 The court in Wyatt proceeded to find that the measure before it was in fact a form of referendum—a “legislative act[]"’ that would be effective only upon approval by the statewide voters—rather than a mere advisory ballot question. (Wyatt v. Kundert, supra, 375 N.W.2d at pp. 191-192.) See also Wagner v. Summers (1913) 33 S.D. 40 [144 N.W. 730], in which the South Dakota Supreme Court upheld a statute specifying that acts of local legislatures (except time-sensitive matters affecting public safety)—including those legislative acts that did not make law but, as in that case, merely granted a permit by resolution—were subject to the electorate’s veto review by referendum at the ballot. In reaching this conclusion the court stressed that the legislature enjoyed power “except as it is limited by the state Constitution and federal Constitution” and that all presumptions favored upholding legislation (id., 144 N.W. at *538 p. 732). The court rejected an argument that the justices should set “some limit to the character of the acts which may be referred to the electors,” and held instead that “the Legislature in its wisdom must be left to prescribe what acts . . . may be referred [to the voters at the ballot], and that courts are without authority to declare limitations where none are prescribed by the Legislature.” (Id., at p. 733, italics added.)

 Likewise, the majority’s analysis rejecting the structural points raised by petitioners (maj. opn., ante, at pp. 513-519) applies as well to advisory ballot measures outside the article V context. (See post, pt. III.)

 In other words: “[U]nlike the United States Congress, which possesses only those specific powers delegated to it by the federal Constitution, it is well established that the California Legislature possesses plenary legislative authority except as specifically limited by the California Constitution.” (Marine Forests Society v. California Coastal Com. (2005) 36 Cal.4th 1, 31 [30 Cal.Rptr.3d 30, 113 P.3d 1062].) “ ‘The most cursory examination . . . confirms how distinctive state constitutions and governments are. The Federal Constitution restricts the federal government both by imposing prohibitions on the government and by granting the government only limited powers. Under state constitutions, by contrast, the second restriction is largely missing, and thus the states exercise plenary legislative power.’ ” (Id., at p. 29.)

 See, e.g., Wilson et al., California’s Legislature (2011) pages 120-121 (describing the use of joint, concurrent, and separate Assem. and Sen. resolutions); Senate Concurrent Resolution No. 37, Statutes 2015 (2015-2016 Reg. Sess.) resolution chapter 48 (filed with Sect, of State, June 2, 2015) rules 5 and 6, concerning adoption of the joint rules of the Senate and Assembly for the 2015-2016 Regular Session; compare 58 Cal.Jur.3d (2012) Statutes, section 2, page 371 (“A . . . joint or concurrent resolution is one that is concurred by both houses of the legislature” and “takes effect upon the filing of it with the Secretary of State”; a “resolution is not a legislative act, and the legislature in passing a resolution does not exercise its lawmaking power”).

 See, e.g., Joint resolutions urging building of national railroad (Stats. 1849-1850, p. 465); Senate Joint Resolution No. 8, Statutes 1919 (1919 Reg. Sess.) resolution chapter 15, page 1439 (urging that loans made to war allies not be forgiven or cancelled); Assembly Joint Resolution No. 6, Statutes 1919 (1919 Reg. Sess.) resolution chapter 17, page 1440 (urging acquisition of “ ‘Lower California’ ” and the Coronado Islands from Mexico); Senate Joint Resolution No. 18 (Stats. 1919 (1919 Reg. Sess.) resolution chapter 29, page 1461 (urging support for self-determination of Ireland); Senate Joint Resolution No. 23, Statutes 1982 (1981-1982 Reg. Sess.) resolution chapter 15, page 6701 (urging counseling and treatment for Vietnam veterans *540 suffering from posttraumatic stress disorders); Assembly Joint Resolution No. 8, Statutes 1993 (1993-1994 Reg. Sess.) resolution chapter 11, page 7766 (seeking federal assistance to fund services for undocumented immigrants); Assembly Joint Resolution No. 57, Statutes 2002 (2001-2002 Reg. Sess.) resolution chapter 183, page 8029 (urging that enforcement of immigration law remain a federal responsibility, and not a state or local law enforcement responsibility); Senate Joint Resolution No. 7, Statutes 2005 (2005-2006 Reg. Sess.) resolution chapter 35, page 6022 (urging Congress to protect women’s right to equal pay for equal work); Assembly Joint Resolution No. 6, Statutes 2005 (2005-2006 Reg. Sess.) resolution chapter 57, page 6053 (urging relief and support for Darfur and its people); Senate Joint Resolution No. 16, Statutes 2008 (2007-2008 Reg. Sess.) resolution chapter 68, page 5753 (urging establishment of an emergency prescription program for veterans); Senate Joint Resolution No. 28, Statutes 2008 (2007-2008 Reg. Sess.) resolution chapter 107, page 5818 (urging new sodium consumption guidelines); Assembly Joint Resolution No. 49, Statutes 2008 (2007-2008 Reg. Sess.) resolution chapter 98, page 5803 (urging that the Cal. gray whale be listed as an endangered species); Senate Joint Resolution No. 21, Statutes 2014 (2013-2014 Reg. Sess.) resolution chapter 32 (urging that Turkey acknowledge the Armenian Genocide).
Concerning the general use of resolutions in California and nationwide, see, for example. Note, Legislative Notes and Reviews (1920) 14 Am. Pol. Sci. Rev. 672, 674 (“[d]uring the legislative sessions of 1919 over 300 resolutions and memorials were adopted [nationwide], of which 206 [were] of general public interest and 117 . . . questions of local interest”; in 1919 alone numerous state legislatures, including California’s, enacted resolutions concerning the League of Nations, aliens and immigrants, military personnel, education issues, women’s suffrage, transportation issues, and commodity prices, etc.); Leckrone and Gollob, Telegrams to Washington: Using Memorials to Congress as a Measure of State Attention to the Federal Policy Agenda (2010) 42 St. & Local Gov’t Rev. 235, 239-240 (finding that more than 3,900 substantive “memorials,” or resolutions, were submitted by state legislatures to Congress from 1987 to 2006; the Cal. Legislature was the most active, with 542 during that period; and that nationwide, such measures were used to send signals to the federal government across a broad range of policy issues, especially those “topics traditionally reserved to Congress,” including “defense and international relations and foreign aid” as well as “environment, health, and public lands [under] federal control”); Filindra and Kovacs, Analyzing US State Legislative Resolutions on Immigrants and Immigration: The Role of Immigration Federalism (2012) 50 Int’l Migration 33, 36 (of 36 resolutions by state legislatures to Congress between 1993 and 2007 concerning immigration issues, California issued 25).

 Incidental powers are implied in order to permit the Legislature to operate within its proper sphere. “ ‘When a legislative body has a right to do an act it must be allowed to select the means within reasonable bounds.’ ” (Parker v. Riley, supra, 18 Cal.2d at p. 91, quoting Attorney-General v. Brissenden (1930) 271 Mass. 172, 180 [171 N.E. 82].)

 The author reports that “[o]f the ninety-eight advisory measure outcomes assessed over a decade, 81.6 percent” of the time, the question-posing county board or city council “complied with voter sentiment” and that the “overall compliance rate with advisory votes increases to 87.8 percent when considering only the measures over which the local government [had jurisdiction to] directly exercise authority.” (Government by Advice, supra, 47 St. & Local Gov’t Rev. at p. 97.) Regarding situations in which the voters’ advice is rejected, the author mentions the City of Arroyo Grande measure described ante, text and footnote 22, and comments: “Despite the vote outcome, the City of Arroyo Grande reportedly used the revenue for all foui' advisory measure purposes .... Elected officials likely saw little political risk to such noncompliance since the other approved uses were honored, general revenues are fungible, and the disapproved action [upgrades to meet Americans with Disabilities Act of *543 1990 requirements] complied with a higher-level government mandate.” (Government by Advice, at p. 98.) Further reflecting on instances in which the local board or council ultimately took a position amounting to noncompliance, the author comments: “[A] handful of cases illustrate that even when failing to comply with voter wishes, government decisions are sometimes shaped by critical information uncovered in the response to advisory votes. This measured discretion available to government officials is appealing to critics of direct democracy troubled by citizens making formally binding decisions on complex policy questions.” (Id., at p. 99.)
A similar point has been made concerning the effect of advisory measures in other countries. (DuVivier, The United States as a Democratic Ideal? International Lessons in Referendum Democracy, supra, 79 Temp. L.Rev. 821.) There the author observes: “[A]n advisory referendum often proves preferable to one that binds. First, it does not conflict with an existing system of government that requires legislative supremacy. For example, in the United Kingdom, the ‘notion of parliamentary sovereignty’ dictates that Parliament cannot be formally bound by an advisory referendum. Consequently, an advisory referendum exerts pressure while simultaneously preserving the existing governance system. Second, an advisory process better reflects the reality that government actors must interpret and implement any measure. An advisory referendum allows a legislature flexibility to predict the outcome of a provision in a manner that reconciles possible conflicts and anticipates constitutional challenges in the courts.” (Id., at p. 848, fns. omitted.)

 See Gould, Report on Materials of Constitution Revision Commission Relating to Provisions in California Constitution Recommended or Endorsed by Com. (Dec. 10, 1974) pages 1-2 (prepared for J. Rules Com. of Cal. Leg.; describing the history of Commission and its relation to the Legislature) (Report on Commission Materials); see Californians for an Open Primary v. McPherson (2006) 38 Cal.4th 735, 752-753 [43 Cal.Rptr.3d 315, 134 P.3d 299] (describing the 1950s-1960s history relating to the 1966 recommendations of the Commission).

 See generally Report on Commission Materials, supra, at pages 14-16 (describing the Commission’s three initial Cal. Const., art. IV committees—the Committee on Initiative & Referendum; the Committee on Legislative Procedure & Compensation; and the Committee on Restrictions on Legislation & on Crimes—and the provenance of the eight drafts considered by those committees and the Commission as a whole concerning art. IV); see 1 State Constitutional Conventions, Commissions & Amendments 1959-1978: An Annotated Bibliography (1981) (listing, among numerous other documents circa 1964 to Feb. 1966, seven reports by the Commission to the Legislature concerning art. IV; and at least eight drafts of art. IV). Finally, Dean of University of California, Berkeley, School of Law (Boalt Hall) Frank *544 Newman, later a justice on this court, served prominently as one of 50 members of the Commission. He donated to this court’s library his copies of the extensive working papers in this regard.

 In this regal'd the Revision of Article IV study explained that as a general matter the Commission proposed “two types of changes”—revisions and deletions. With regard to deletions, the study observed that “specific delegations of power to the Legislature” were “actually never needed in the Constitution” because “ ‘It is accepted constitutional doctrine that state government is a government of inherent powers and that a state constitution unlike the Constitution of the United States is a document of limitations and not of grant, i.e., whereas the federal government has only specifically delegated powers, state government has all the powers of government except insofar as these powers are constitutionally limited.’ ” (Revision of Article IV, supra, at p. 2.) Likewise, see also the general comments made by Commission member (and chairman of the reorganized Cal. Const., art. IV subcommittee that had taken the place of the prior three committees) James Beebe, testifying before the Legislature’s Joint Committee on Legislative Organization. Addressing the general subject of “restrictions on the Legislature” that would be imposed by the proposed article, he explained that specific grants of power could be eliminated because it was established by case law that the Legislature already has “all of the power not expressly denied to it in the Constitution.” (J. Com. on Legislative Organization, transcript of healing (Nov. 6, 1964) p. 46.)

 As the majority observes, the people’s right to instruct their representatives was set out in our initial charter in 1849 and remains in the 1879 Constitution as amended today. I note that 14 other state constitutions include the same provision. (Fla. Const., art. I, § 5; Idaho Const., art. I, § 10; Kan. Const., Bill of Rights, § 3; Me. Const., art. I, § 15; Mass. Const., pt. 1, art. XIX; Mich. Const., art. 1, § 3; Nev. Const., art. I, § 10; N.H. Const., pt. 1, art. XXXII; N.C. Const., art. I, § 12; Ohio Const., art. I, § 3; Or. Const., art. I, § 26; Tenn. Const., art. I, § 23; Vt. Const., ch. I, art. XX; W.Va. Const., art. Ill, § 16.) In addition, a few additional state constitutions provide that the people may “make known their opinions to their representatives.” (Ill. Const, art. I, § 5; see Iowa Const., art. I, § 20; N.J. Const., art. I, par. 18; see also Wyo. Const., art. I, § 21 [guaranteeing the people’s right “to make known their opinions”].)
On a related point, regarding the decision of this court in American Federation of Labor v. Eu (1984) 36 Cal.3d 687 [206 Cal.Rptr. 89, 686 P.2d 609] (AFL v. Eu), holding that the initiative provision of the California Constitution does not authorize the voters to place an advisory *546 question on the ballot through an initiative measure, and which case is discussed in the majority opinion. Justice Liu’s concurring opinion, and Justice Chin’s dissenting opinion: I note that in AFL v. Eu no party brought to the court’s attention the provision of the California Constitution explicitly granting the people “the right to instruct their' representatives” or argued that in light of that constitutional right, the initiative provision of the California Constitution should be interpreted to permit the people to exercise their' constitutional right to instruct their' representatives through an advisory initiative measure. By contrast, when the question of the validity of a similar advisory initiative measure came before the Idaho Supreme Court after this court's decision in AFL v. Eu, the Idaho court held that the advisory measure could be submitted to the voters through the initiative process as an exercise of the people’s state constitutional right to instruct. (Simpson v. Cenarrusa (1997) 130 Idaho 609 [944 P.2d 1372, 1377].) Because the present case does not involve an advisory initiative measure, nothing in the court’s opinion should be viewed as speaking to this point.

 Indeed, at the time of the 1911 election at which the direct democracy provision was submitted to the voters, the Legislature was exercising such authority to ask the voters’ advice at the upcoming primary and general elections of 1912, concerning which candidate the Legislature should appoint as California’s United States Senator. (See ante, part I.A.)

 See Elections Code section 9034, subdivisions (a) and (b) (initiative proponents must immediately advise the Secretary of State when they have collected 25 percent of the signatures necessary for qualification on the ballot, at which point each house of the Leg. must assign the initiative measure to its appropriate committees and hold joint public hearings not later than 131 days before the date of the election at which the measure is to be voted upon); id., section 9604, subdivision (a) (allowing initiative proponents to withdraw an initiative at any time prior to qualification—hence permitting initiative proponents to leverage their' signature-gathering efforts in order to promote appropriate legislative compromises, resulting in a statute enacted by the Leg. rather than an initiative measure placed on the ballot).

 With respect, I find the conclusions of Justice Liu’s concurring opinion—that the Legislature lacks general authority to pose advisory questions to the state’s voters, but that article V of the United States Constitution grants the Legislature the authority to pose advisory questions to the state’s voters with respect to a proposed federal constitutional amendment— untenable for a number of reasons.
Lirst, as this opinion explains, every judicial decision that has addressed the issue, and every academic commentator that has spoken on the issue, has concluded that a state legislature generally has the authority to place advisory questions on the ballot. Justice Liu’s concurring opinion cites no authority to support its contrary conclusion.
Second, the historical background of California’s 1879 Constitution—the charter that, as amended, remains in place today—strongly demonstrates that the framers of the 1879 Constitution, as well as the California voters who adopted the proposed Constitution, understood that the California Constitution permits the Legislature to place an advisory question before the voters. That the subject matter of the particular advisory ballot measure at issue at that time happened to be discriminatory and offensive (see ante, pt. II.A., and conc. opn. of Liu, J., post, at p. 571) does not negate the fact that the Constitution’s framers and the voters clearly viewed a legislatively initiated advisory ballot measure as a constitutionally permissible procedural mechanism. This procedural instrumentality or tool—an advisory ballot measure—is not by its nature invariably discriminatory or offensive.
*550 Third, the concurring opinion’s novel thesis—that by granting legislative authority to the Legislature, the 1849 Constitution (and the 1879 charter, as amended) deprived the state’s electorate of the authority to vote on an advisory measure submitted by the Legislature (conc, opn. of Liu, J., post, at pp. 564-566)—flies in the face of literally scores of legislatively initiated advisory ballot measures that have been submitted to statewide voters, both in California and throughout the country from this nation’s inception. The concurring opinion declines to pay any respect to this substantial “page of history.”
Fourth, Justice Liu’s concurring opinion posits that the Legislature might in the future employ advisory ballot measures to submit questions to the electorate in an inappropriate and disingenuous manner, that the voters would succumb to such tactics rather than penalize legislators who act improperly by voting them out of office, and that courts need to intervene by barring all such measures from the ballot. (Conc. opn. of Liu, J., post, at pp. 576-579.) As Justice Corrigan stresses in her own concurring opinion (conc. opn. of Corrigan, J., post, at p. 551.) Justice Sparks’s opinion in Schabarum v. California Legislature, supra, 60 Cal.App.4th 1205, appropriately explains that separation of powers principles militate against any such judicial impulse to police the Legislature’s exercise of its authority. Moreover, although advisory question ballot measures have long been employed nationally and locally, the concerns raised by hypothesized ballot questions set out in Justice Liu’s concurring opinion have not materialized in practice.
Fifth, if, as Justice Liu’s concurring opinion maintains, the vesting of legislative authority in a legislature inherently deprives the Legislature of the power to pose advisory questions to the electorate, it appears illogical for the concurring opinion to conclude that article V of the United States Constitution impliedly grants the Legislature that authority with respect to proposed federal constitutional amendments. Nothing in the language or history of article V purports to grant a state legislature such authority and the federal Constitution has never been interpreted to grant the federal legislature—Congress—the implied power to submit an advisory question to the electorate, either with respect to a proposed federal constitutional amendment or any other subject.
Finally, I question two additional statements in Justice Liu’s concurring opinion. First, the concurring opinion states that there is no disagreement with the holding in AFL v. Eu, supra, 36 Cal.3d 687, 707-714, that the initiative provision of the California Constitution does not authorize the voters to place an advisory question on the ballot through an initiative measure. (Conc. opn. of Liu, J., post, at p. 572.) As observed ante, footnote 36, because this case does not involve the validity of an advisory initiative measure, the court’s opinion cannot properly be viewed as expressing any view on that question. Second, the concurring opinion asserts that “the Legislature does not have general authority to submit statutes for voters to approve.” (Cone. opn. of Liu, J., post, at p. 579.) The assertion on that point appeal's debatable, particularly in light of the language and history of article II, section 12 of the California Constitution, but the question whether the Legislature may place a proposed nonadvisory statute on the ballot for the voters’ approval or disapproval is also not before us in this case and the court’s opinion does not address that question.